# Jake Shoemaker, Porter Shoemaker and Fred Yost v. Commonwealth.

(Decided March 8, 1927.)

## Appeal from Lee Circuit Court.

1. Homicide—Admitting Testimony of Deceased's Widow that Deceased Came to House 4 or 5 Minutes Before Shooting and Stated Defendants were After Him to Kill Him Held Prejudicial Error.—In prosecution of three defendants for murder, admitting testimony of widow of deceased that deceased came into house and said defendants were after him to kill him, made in absence of defendants and 4 or 5 minutes before any shooting was done, held prejudicial error, testimony being incompetent.

2. Homicide—In Prosecution for Homicide, Question of Defendants' Guilt Held for Jury.—In prosecution of three defendants for murder in shooting deceased, who had gone to his house and armed himself, evidence held sufficient to take issue of defendants' guilt to jury.

3. Criminal Law—Alleged Improper Argument of Attorney, Held Not Available, Only Objection Disclosed Being in Motion for New

Trial and Not in Bill of Exceptions.—Alleged improper conduct of attorney for commonwealth in argument held not available as ground for reversal, where bill of exceptions did not disclose that remarks were objected to' or that any ruling was made thereon; question being presented for first time in motion for new trial.

4. Criminal Law—Statement that Defendant Accused of Murder had Been Convicted of White Slavery, if Made by Prosecuting Attorney, Held Improper.—In prosecution for murder, statement to jury that one of defendants had been convicted of transporting female from one state to another and of crime of white slavery, if made by prosecuting attorney in course of argument, held improper, as evidence thereof, if offered, would have been incompetent.

5. Criminal Law—In Prosecution of Several Defendants, Instructions Should Permit Verdict Under Evidence Against One or More Without Convicting All.—In prosecution of several defendants for murder, instructions should be so framed as to make clear jury's right to find one or more of defendants guilty under evidence without convicting all.

S. P. STAMPER, J. K. ROBERTS, ROSE & STAMPER, J. F. SUTTON and LUCIAN SMITH for appellants.

F. E. DAUGHERTY, Attorney General, and MOORMAN DITTO, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE— Reversing.

Tried under an indictment which charged them with murder, appellants, Jake Shoemaker, Porter Shoemaker and Fred Yost, were found guilty of manslaughter and prosecute this appeal from the judgment of the Lee circuit court so convicting them and fixing their punishment at confinement in the state penitentiary for a term of six years.

Consideration of appellants' assignments of error makes it necessary to summarize the facts. A number of witnesses who testified heard the fusillade of shots, by some of which Frank Baker was killed, and the number of shots are variously estimated to have been from twenty-five to thirty-five. No eye-witness to the tragedy testified for the commonwealth. A number of witnesses who went to the scene of the shooting some time after it had occurred described the position of the dead and wounded. Deceased, Frank Baker, was found lying dead within four or five feet of the track of the L. & N. rail-

road, which runs near his home, and on that side of it next to his residence. His brother, Elihu Baker, mortally wounded, was found lying just at the edge of a small field of corn growing along the railway and in, fifteen or twenty feet of and on the same side of the railroad as Frank Baker. The latter's pistol was found lying on the ground near him, with some loaded and some exploded cartridges in the cylinder. Elihu Baker had in his hands a single barrel shot gun and there were several loaded and several exploded shells on the ground near him. Frank Baker's home stood on a hill overlooking the railroad right of way and about one hundred yards from the place where he and his brother were found. The tragedy occurred on August 8, 1926. The land between Baker's home and the railroad track was covered with growing corn which then had virtually reached maturity. A path led from his home to the railroad right of way through this field of corn, and Frank Baker was found just about the point where that path ran from the cornfield into the railroad right of way. Two mortal wounds appear to have been inflicted on Frank Baker, one in the body and the other in the head; and the evidence tends to establish that the bullet which struck him in the head was fired after he had fallen to the ground, as it appears to have passed out the top of his head and entered the ground above him. Elihu Baker was wounded in the head and subsequently died, apparently without having made a statement, as no dying declaration from him was introduced in evidence. Immediately across the railroad track from where Frank Baker lay, appellant, Jake Shoemaker, was found so badly wounded from a shot which struck him in the groin that he was unable to stand. His son, appellant, Porter Shoemaker, was found on the same side of the railroad track also so badly wounded from a shot that struck him in the abdomen and ranged downward into his thigh that he was unable to stand. Appellant, Fred Yost, was found at the scene of the shooting unwounded; and the witnesses who testified for the commonwealth stated that when they approached he had in his possession a Winchester rifle and permitted them to approach only after he had ascertained who they were, but would not permit them to disturb the dead and wounded until the sheriff and the coroner arrived. The shooting occurred about ten o'clock at night of August 8, 1926. The magistrate for that district of Lee county

testified that about eight o'clock that night appellant, Jake Shoemaker, came to his home, made affidavit and procured a warrant of arrest for deceased, Frank Baker, charging him with having drawn a pistol on him, the affidavit alleging that to have occurred the afternoon of August 8th near Fincastle, Kentucky. The wife of one of Jake Shoemaker's brothers testified that about nine o'clock that night he came to the home of her husband and borrowed his pistol. Some four or five witnesses testified to having seen all three of the appellants at the railroad station, Fincastle, at the time a passenger train stopped there at 9:17 that night, and that the two Shoemakers had pistols in their hands at the time. Two or three witnesses testified that, between the time church services at a church near the Fincastle railroad station ended and the time the train ran, Jake Shoemaker inquired to know whether the junior lodge had broken; and two witnesses testified that he was informed by someone that they supposed the lodge had broken as they had seen Frank Baker and Byrden Shoemaker going down the railroad toward Baker's home. They further testified that shortly after obtaining that information the three appellants started down the railroad in the same direction that Baker had gone, one of them having a lantern. Byrden Shoemaker testified that he and Frank Baker attended the junior lodge that night and that afterwards and shortly before the 9:17 train ran they saw the three appellants approaching and avoided meeting them by hiding; and that after they had passed Baker started in the direction of his home. The commonwealth introduced the surviving widow of deceased, Frank Baker, and, over the objection of appellants, she was permitted to testify as follows:

"I saw him something near ten o'clock, I don't know just exactly what time it was, I never looked; he came to the door and called me 'to let him in right quick, they was after him;' I got up and opened the door and he came in the house, and I asked him 'Who?' and he told me 'Jake Shoemaker, Porter Shoemaker, Fred Yost and Alice Shoemaker and Nellie Shoemaker,' and I asked him what was they after him for, and he said 'He reckon to kill him because he had made the threat at Fincastle.' "

The defendants for themselves testified in effect that after Porter Shoemaker procured the warrant of arrest for deceased, Frank Baker, they went to Fincastle, hoping to find a deputy sheriff to whom the warrant could be delivered, and remained there until after the 9:17 train ran, and were at the depot when it came, hoping that a deputy sheriff, whose sister lived at Fincastle, might get off the train there that night. Jake Shoemaker's home was in the same direction from Fincastle that deceased, Frank Baker's, was, and in going to their home their shortest and most practical route was along the railroad right of way, which ran in about one hundred yards of [Baker's home. However, they stated that they left Fincastle with the intention of walking to Beattyville that night, Jake Shoemaker's purpose being to deliver the warrant of arrest to a peace officer for execution, Porter Shoemaker intending to go on an excursion to Natural Bridge the following morning, and Yost, who had been at the Shoemaker home for several days, going along merely for company. The route to Beattyville was along the railroad by Baker's home. Jake Shoemaker admitted borrowing the pistol from his brother, but explained that by saying that his own pistol had not been used for so long that he did not know whether it was reliable and that the cartridges he had were so old that he did not know whether they could be depended upon, and that he was afraid to make this trip at night without the protection of a dependable firearm. They stated that they left Fincastle after the train had run without any idea that they would encounter the Bakers; that Porter Shoemaker and Fred Yost were ahead, the former carrying the lantern, and that Jake Shoemaker was some fifteen or twenty feet behind them. They testified that after the former two had passed the point where the path from Baker's house enters the railroad right of way and just as the latter was passing that point Frank Baker, from the edge of his cornfield, about the mouth of the path, said: "Jake Shoemaker, you looking for me?" and began immediately to shoot. Jake Shoemaker testified that he was struck in the groin by the first shot that was fired and knocked down. The three defendants testified that immediately after Frank Baker began to shoot some one else near him also began to shoot with a shotgun, and that a third person from the cornfield also began

to shoot a pistol. Jake Shoemaker testified that when the shooting began he had both his own and the pistol which he had borrowed from his brother, and that after he was knocked down he emptied both of them, his shots being directed by the fire from the pistol and shotgun of his two assailants who were closest to him in the edge of the cornfield. He also testified that a third person was shooting from another point in the cornfield. He testified that the cartridges in the cylinders of the pistols he had were all he had, and after discharging them he had no more ammunition. Porter Shoemaker and Fred Yost testified that neither of them had any kind of weapon or took any part in the shooting; and Porter Shoemaker testified that he was wounded by a pistol ball fired by the third person in the cornfield whom nobody recognized and whose identity was never established. Tom Johnson, who was 85 years of age when he testified, and who lived about a quarter of a mile distant, and his nephew, Wash Johnson, appear to have been the first persons to reach the scene of the shooting after it occurred. They testified for the defendants. They both described the position of the dead and wounded when they arrived on the scene, and testified that as they approached they heard the appellant, Yost, calling for help and saying, "Whoever you are in the cornfield there don't shoot any more; there is enough hurt now; for the Lord sake don't shoot any more." When they arrived neither Porter Shoemaker nor Yost had a weapon of any kind, and Jake Shoemaker stated to them that he had no more ammunition, and requested that they send back to Tom Johnson's home for his Winchester rifle to protect them from any further danger. Wash Johnson then went to his uncle's home and procured his Winchester rifle and returned with it. They and defendants testified that it was Tom Johnson's rifle procured in this way after the shooting was over which Yost had when the witnesses introduced for the commonwealth subsequently came to the scene of the tragedy. The defendants introduced evidence that deceased, Frank Baker, a short time previous to this had accused Jake Shoemaker of stealing two of his turkeys, and that he had threatened to kill him on several occasions, and that on the afternoon of August 8th he had drawn a pistol on him and threatened to kill him near the town of Fincastle.

While the testimony for the commonwealth tended to establish that the three appellants were seeking deceased, Frank Baker, on the night he was killed, the testimony as a whole, especially the uncontradicted evidence as to where the parties were when this tragedy occurred, and the position of the dead and wounded when the battle was over, and the uncontradicted evidence that the rifle which the witnesses for the commonwealth testified that appellant, Yost, had when they reached the scene of the encounter was brought there by the witness, Wash Johnson, after the shooting was over, tends rather strongly to substantiate the version of this tragedy given by the defendants. There is no evidence that any of them were ever any closer to the home of deceased than the railroad track. The evidence from Mrs. Baker establishes that her husband and her brother left his home four or five minutes before the shooting occurred, both of them armed. Doubtless if they had remained at home this tragedy would never have been enacted. The evidence establishes that Frank and Elihu Baker were shot down where their bodies were found within a few feet of the railroad and approximately one hundred yards from their home.

The evidence from Mrs. Sarah Baker, the surviving widow of deceased, Frank Baker, which we have quoted hereinbefore, at least that portion of it wherein she stated what her husband said to her immediately before leaving the house for the scene of the tragedy, was clearly incompetent. None of the defendants were present; it was said, according to her testimony, four or five minutes before any of the shooting was done. Her husband's brother had time after it was said to dress and arm himself and go to the scene of the tragedy some hundred yards away before the shooting occurred. Her testimony as to the haste with which her husband and his brother armed themselves, left his residence and reached the scene of the tragedy, rather substantiates the defendants' theory. There seems to be no conflict in the evidence that the three appellants left Fincastle, one of them carrying a lantern, not very long after deceased, Frank Baker, had left there. Whether they were going home or to Beattyville, the route was along the railroad. It is altogether reasonable to infer that before he reached home Frank Baker became aware that others were coming along the railroad behind him and recognized

them by the light of the lantern which they carried, and concluded that an opportunity was presented for putting into execution his previously expressed intention to kill Jake Shoemaker. With that in mind he hastened to his home, aroused his brother, and then, after arming themselves, intercepted appellants as they passed. It certainly is true that immediately before he and his brother armed themselves, left their home and went to the scene of the tragedy deceased might not make evidence for himself by telling his wife the things which she testified herein that he did. None of the things said by deceased to his wife at their home before this tragedy occurred were competent; and as they appear to have been the strongest testimony for the commonwealth in the case against appellants, it is impossible to escape the conclusion that this evidence was prejudicial.

We can not sustain appellants' contention that the court erred in not peremptorily instructing the jury to acquit them. The evidence herein is sufficient to take the case to the jury. In view of the fact that the case must be reversed for the error in admitting incompetent testimony, we deem it unnecessary to discuss and determine the question whether the verdict of the jury is flagrantly against the evidence and that question is reserved.

Appellants complain of improper conduct upon the part of the attorney for the commonwealth in the concluding argument. We find, however, that the bill of exceptions does not disclose that any objection was made to the argument or what remarks of the attorney for the commonwealth were objected to or what the ruling of the court was on the objection. The question is presented for the first time in the motion and grounds for a new trial. It has been repeatedly written that errors of law committed upon the trial of a case to be available as grounds for reversal upon the appeal to this court must be shown by the bill of exceptions. In view of the fact that the case must be tried again, however, we deem it not improper to add that, if the attorney for the commonwealth made the statement in his argument to the jury, attributed to him by appellants in their motion and grounds for a new trial, to the effect that appellant, Fred Yost, had been convicted of transporting a female from one state to another and of the crime of white slavery, it was wholly improper, as the record contains no evi-

dence of the fact, and the evidence if offered would have been incompetent.

This court's examination of the instructions given has led to the conclusion that perhaps instruction No. 1 would more clearly have presented the law if at the close of the first literary paragraph, where the instruction reads: "They will find the defendants guilty, guilty of willful murder, etc.," it had read: "You will find the defendants, or the one or ones of them you may so believe from the evidence so to have done, guilty, etc."

For the reasons indicated the judgment herein is reversed and the cause remanded, with direction that appellants be granted a new trial, and for further proceedings consistent herewith.