# Fitch v. Commonwealth.

(Decided March 9, 1937.)

LITTLETON & JARVIS for appellant.

B. M. VINCENT, Attorney General, and A. E. FUNK, Assistant Attorney General, for appellee.

Opinion of the Court by Chief Justice Ratliff— Reversing.

Robert Fitch was indicted by the grand jury of Carter county for the murder of Josephine Myers. He was tried at the September, 1936, term of the court, convicted of manslaughter, and sentenced to two years in the State Reformatory. He appeals.

Grounds relied on for reversal are: (1) The refusal of the court to peremptorily instruct the jury to find the defendant not guilty; (2) the court erred in permitting improper and incompetent evidence to go to the jury; (3) the court erred in giving to the jury an instruction on manslaughter and failing to give the whole law of the case; and (4) the court erred in overruling appellant's objections to the Commonwealth Attorney's improper argument to the jury and permitting same to go to the jury. We will discuss these points in the order named.

Appellant was 31 years of age, married, and had a family residing in the State of Ohio, where he was reared and had formerly lived before he came to Kentucky in the spring of 1936, to manage a newspaper sales campaign for a local newspaper at Morehead, Ky. While engaged in this newspaper work he became acquainted with the deceased. After the newspaper sales campaign was over he bought an interest in a roadhouse in Carter county, known as the Driscoll House, where deceased was working as a waitress, and she continued to work there until the time of her death, June 17, 1936. Deceased was married and had a child, but she and her husband were not living together. On the morning of the day of the homicide, which occurred at about 10 o'clock p. m., deceased told appellant that she was going to Ashland to pay the premium on her insurance. It appears that she "hitch-hiked" to Ashland and back to the roadhouse, where the homicide occurred, and after her return she engaged in the usual work waiting on the customers, etc. The kitchen was in a separate room from the main serving room, and there was a small swinging gate in the entrance to the kitchen, leading from the serving room. Appellant and deceased went into the kitchen, and in a few minutes the shot was fired that resulted in deceased's death. At that time

Effie Collins and Allen Owen were sitting in a booth in the main serving room, and Buddy Banks and Callie Salyers were sitting on the front porch in front of the main serving room with their backs to the windows of the serving room and the door between the kitchen and serving room. When they heard the report of the shot, they turned and looked in the direction of the kitchen and saw appellant by the side of or near the kitchen door, and he said, "Josephine has shot herself." Banks and Salyers immediately went into the kitchen and found the deceased sitting on a stationary or built-in table in the kitchen, leaning against the wall, her head slightly slumped to one side, with a bullet wound just above the nose and approximately between the eyes or eyebrows. Her legs were crossed and a .25-caliber automatic pistol, which belonged to appellant, lying in her lap with her fingers on or around the trigger guard. She was dead at that time. There was also a wound on deceased's forehead about or near the entrance of the bullet, indicating, according to the evidence of some of the witnesses, that she had been struck with some blunt instrument. However, according to the evidence of some of the witnesses, this wound could have resulted from the muzzle of the pistol and the shot which entered her forehead. But other witnesses seemed to think that this wound did not result from the pistol. There was a blackjack found in the kitchen which appellant said had been left there by some one, perhaps the man whose interest in the business he had purchased. The blackjack was fitted to the indenture or wound and apparently fit exactly. There were also some discolorations or bruises found on the legs of the deceased. The witnesses who were sitting on the front porch, as well as all those who were around the place of business, all testified that they heard no words or anything indicating a struggle between appellant and deceased, and the report of the pistol was the first thing that attracted their attention. The witnesses who were on the front porch, who first saw appellant after the shot was fired, said that it was but a few seconds after the shot was fired until they saw appellant appear at the door, and they gave it as their opinion that appellant would not have had time to have placed the pistol in deceased's lap and place her hand on it and appear at the door as soon as he did. There were also two

handkerchiefs lying on the table beside the deceased with blood on them, but appellant denied that the handkerchiefs were his or that he knew anything about them whatever. It appears that some blood had trickled from deceased's forehead down into her lap and possibly onto the table. Appellant was the only eye-witness to the homicide, and he denied that he shot deceased and said that she shot herself and detailed the occurrence, which we will later review. In addition to the facts stated above, there is some evidence to the effect that appellant and deceased were on intimate terms and that he was very much infatuated with her.

Arkie Rose testified to a conversation he had with appellant on the morning preceding the homicide, as follows:

"Q. Mr. Fitch say anything to you on one morning or one evening or one day at noon, with reference to Josephine on the morning that Josephine· was killed that night? A. Same day Josephine was killed I was out back and Mr. Fitch came out in back where I was and he was standing in the kitchen door—

"Q. Tell the condition he came out in? A. I couldn't say the condition he came out in, he was standing there when I looked around. When I looked around he was crying; I said what is the matter Bob, have you got something up your sleeves and kinda laughed. I always carried on with Robert like I would a brother. He said—I don't know the exact words—I just can't—I don't know how he did make that statement just exactly.

"Q. Think about it and tell the jury as near as you can just what he said. A. Well, he said he and Josephine had been arguing; I said I don't know why you don't leave Josephine alone, Josephine don't like you and you don't like Josephine, why don't you all cut this out; he said Billie, I can't, I love Josephine and she knows it; I can't leave her alone."

Mrs. Gertrude Meyers, mother of the deceased, testified that some time previous to the homicide appellant had made some visits to her home and talked to

her about the deceased. She was asked and answered as follows:

"Q. At any of those trips did the defendant Fitch say anything to you with reference to Josephine? A. He come to my house one night late and talked to me.

"Q. Tell the jury in your own language as near as you can remember what he said? A. I can't remember everything. That night I was asleep and the car woke me up, it woke me up, I got up and went out on the porch, I went out and I said well; he says you will kinda be surprised me being here this time a night—

"Q. What did he call you? A. Mom. And he just come and wanted to talk to me and I would say Bob I am sorry for people that is in trouble, about all I said; he just opened up—

"Q. What did he say, Mrs. Meyers? A. He said he loved Jo, makes no difference what Jo had done and he was crazy; God damn I am crazy, things can't go on like this, there has got to be change, and then he would stop and put his head on the steering wheel; I would say well I am sorry. It was cool that night and I wanted to go in, seemed like I didn't want to hear him. He went ahead to say he was the black sheep of the family; he and Jo would come out alright, one day Jo would tell him something next day tell him something else."

She stated that this conversation was about two weeks before her daughter was killed.

According to the evidence of appellant and other witnesses also, the deceased was intoxicated on the day and evening preceding her death. There was also some evidence that appellant had been drinking on that afternoon and perhaps was intoxicated, but he denied that he was drunk or materially intoxicated. Three doctors testified as to the nature of the wounds on deceased, and it seems that their testimony was not in harmony. Some of them said there were no powder burns about the wound at all, while others said there were powder burns inside the wound but not on the outside. The evidence relating to the pow-

der burns might be sufficient to furnish an inference that the muzzle of the pistol was not placed against decedent's flesh at the time it was fired as related by appellant. William Banks testified that a short while before the homicide he heard deceased say to appellant, in substance, that he had to drop Effie Collins or there was going to be something happen around there. This is the substance of the evidence adduced for the Commonwealth, and which, it is insisted, is insufficient to warrant a submission of the case to the jury. The evidence is in main circumstantial, but we find ourselves unable to conclude that in view of all the circumstances it was insufficient to take the case to the jury. It appears from the evidence that appellant was very much infatuated with the deceased and made statements which might warrant the inference that he was contemplating some desperate act. While such statements may not be construed as threats against deceased, but in the circumstances they were such that reasonable minds may differ as to their meaning and import. And furthermore, the wound on deceased's forehead, indicating that she may have been struck with some blunt instrument and the blackjack found in the kitchen having fitted this wound, might also warrant the inference that this wound was inflicted by appellant. It is admitted that deceased was shot with appellant's pistol.

It is the well-known rule that when there is any evidence direct or circumstantial, though it may be slight, the case should be submitted to the jury. Bond v. Com., 257 Ky. 366, 78 S. W. (2d) 1; Bullock v. Com., 249 Ky. 1, 60 S. W. (2d) 108, 94 A. L. R. 407. We think that the proven facts and circumstances of this case were sufficient for the jury and the court did not err in overruling apellant's motion for a peremptory instruction in his favor

Appellant testifying in his own behalf denied that he shot deceased or struck her with the blackjack or otherwise harmed her. He related what happened from the time he and deceased went into the kitchen up until the time she was shot, as follows:

"Q. Go ahead and tell what happened? A. There was quite a crowd came in gradually during the evening, we went ahead working. Miss Meyers was high in a way and she didn't drink

very much beer, from time to time she drank with the customers but she was in a pretty high condition as it was, so I asked her not to drink too much, to help me take care of the trade. Later on the trade drifted away; Miss Meyers had been helping me with the trade, working very hard; she tended to the sandwich making, I handled the bottled drinks. The trade gradually dwindled away until there wasn't any one else and as help usually do—possibly I shouldn't say that, they don't put stuff away, I went ahead and put the stuff in the ice box, my cheese and ham and all my sandwich material I had, and walked back in the kitchen. Miss Meyers had come in the kitchen in the meantime and had sat down on the table, stationary table that was in the kitchen, I walked in front of Miss Meyers and picked up a loaf of bread, walked over to the bread can some few feet away and was standing obliquely towards her, that is with my shoulder towards her. I heard her make the remark 'here goes Bob'; I turned around and saw her hand lying in her lap, I saw my .25 automatic in that hand, she had just snapped the safety catch and I was stunned, didn't know what was going on, hardly, except that I saw that and just at that time she drew the gun to her head and fired the shot.

"Q. What did you do immediately after the shot was fired? A. Immediately after the shot was fired I ran, ran past her and out the gate out to the gate, just as I was going thru the door Miss Collins was standing just outside the booth and I said, 'Jo shot herself.'

"Q. How many seconds would you say it was from the time that pistol fired until you saw Miss Collins? A. Not ever three seconds."

He also denied making the statements testified to by Mrs. Gertrude Meyers, the deceased's mother, and he also denied that deceased made the remark concerning Effie Collins as testified to by William Banks.

Thomas Alexander testified that on the afternoon preceding the homicide, while deceased was on her way from Ashland, she rode a certain distance with him in his car and told him that she had been to Ashland

to pay her insurance premium, and she said to him, in substance, that she wanted enough money to educate her little boy, and that if she knew she was going to die she would kill herself and that would double her indemnity. There was also evidence tending to show that she had attempted suicide in a hotel in Ashland some time in the summer previous to her death.

There was some other evidence in appellant's favor, but since the case must be reversed upon another ground, we express no opinion as to whether the verdict is flagrantly against the evidence.

One item of the incompetent evidence complained of is that of L. H. Gossett, who testified that a short while before the homicide he was dancing with the deceased and that she remarked to him that she and appellant were not on speaking terms except in a business way. This evidence was objected to, and at that time the court overruled the objections but later admonished the jury not to consider it. It is insisted that this evidence had a prejudicial effect because it was not excluded from the jury at first and much other evidence was taken before the court admonished the jury not to consider it. For the purpose of a determination of this case, it is not necessary to pass on what effect this might have had on the jury. It is sufficient to say that the alleged statement not having been made in the hearing or presence of appellant, it was incompetent and the court should have promptly sustained the objections thereto.

The next complaint is that the court erred in giving to the jury an instruction on manslaughter. It is insisted that appellant was guilty of murder or no crime at all, and there was no evidence warranting an instruction on manslaughter. It is argued that this instruction may have given the jury a basis on which to barter, bargain, and agree on the manslaughter penalty, whereas in all reasonable probability they would not have agreed on a conviction of murder. To sustain this contention appellant cites and relies on certain cases, but an examination of those cases discloses that the facts are different to the facts disclosed in the present case. The wound on deceased's forehead indicating that she might have been struck with a blackjack found in the room or some other in-

strument and the bruises found on her limbs might indicate a struggle. While appellant testified that there was no controversy between him and the deceased, yet the jury might have believed that he thought that the better defense for him was to deny any controversy tending to show motive on his part to kill the deceased, whereas in fact there might have been a controversy. Such inference might be fairly warranted from the evidence of the witness Banks, and the mother of deceased, and other circumstances. It is the rule that where there is any evidence, direct or circumstantial, that the offense might have been committed in sudden heat and passion, it is proper for the court to give the whole law of the case by instructing on all degrees of the offense covered in the indictment. We do not think the court erred in giving the manslaughter instruction. King v. Com., 187 Ky. 782, 220 S. W. 755, and cases cited therein; Bast v. Com., 124 Ky. 747, 99 S. W. 978, 30 Ky. Law Rep. 967.

It is next insisted that inasmuch as the court gave an instruction on manslaughter he should also give an instruction on self-defense. Appellant, who was an eyewitness to the shooting, testified that deceased shot herself, and there is no evidence to support a self-defense instruction. With rare exception it is the rule that where the defendant denies committing the homicide at all, he is not entitled to a self-defense insruction.

Lastly, it is insisted that the argument of the Commonwealth Attorney to the jury was improper and highly prejudicial and the court erred in overruling appellant's objections thereto and failing to admonish the jury not to consider the statements complained of.

In the course of his argument to the jury the Commonwealth Attorney said:

"I told you in the beginning circumstantial evidence was all I had; I have got the bloody flag (exhibiting the man's handkerchief introduced in evidence); that was his; I have got the bloody handkerchief that was his and it is undenied."

The court overruled objections to this remark. This was a misstatement of the evidence. It is disclosed by the record that defendant did deny that the hand-

kerchiefs referred to were his or that he knew anything about them. The Comonwealth Attorney made the further statement, in substance, that the appellant had been living clandestinely with the deceased and going over the country side with her in roadhouses over the country. The court overruled objections to this statement. There was no evidence tending to show that he had been running over the country with her and had her in all the roadhouses or any roadhouse except his own where the homicide occurred and where she was employed. And further said the Commonwealth Attorney: "That is her blood (referring to the handkerchiefs) and this is his handkerchief and it is undenied." Defendant again objected to this statement and the only response made by the court was: "The jury will remember the evidence." The Commonwealth Attorney further said:

"Where did he tell you he was standing when Josephine Meyers fired that shot into her head? He never told you * * *."

Objections were overruled to this statement. The record discloses that appellant did tell where he was standing and detailed the whole incident. And he made this further statement to the jury:

"I believe gentlemen of the jury that any man that forsakes his family without a good and just cause is a black sheep in any family, but there is never a case that justifies a father or mother to forsake that child that they brought in this world, and if he had been at home, taking care of his and letting her (Josephine Meyers) alone, he wouldn't have been tried here today."

Objections to this statement were overruled. This statement was entirely out of the record and improper. Appellant was charged only with the murder of deceased, not for deserting or forsaking his family. It is common knowledge that people are or may be easily prejudiced against a man who deserts or forsakes his family, and the statement of the Commonwealth Attorney was calculated to inflame and prejudice the minds of the jury. The court having overruled the objections to the statement might have impressed the jury with the idea that inasmuch as it was a proper argument it was likewise proper for their considera-

tion in determining appellant's guilt or innocence. As to some of the statements objected to, the court did not expressly overrule or sustain objections but merely remarked that the jury will remember the evidence. This might not have been prejudicial although the statement of the Commonwealth Attorney was improper, and the court should have sustained the objections thereto. The further statement complained of is that the Commonwealth Attorney said to the jury: "This man (meaning appellant) came down the stairs out of Josephine Meyer's room crying," to which statement objections were overruled. Again, this was a misstatement of the evidence in that the witnesses did not state that appellant came out of the deceased's room. There was evidence, however, sustaining the rest of the statement.

And the Commonwealth Attorney further said: "If I thought this man was innocent, you have seen what I have done in other cases, I would write on that indictment filed away or dismissed," to which statement objections were overruled. This court has condemned and held prejudicial arguments of Commonwealth Attorney similar to the last statement quoted above. See Martin v. Com., 255 Ky. 529, 75 S. W. (2d) 13.

Except the statements in reference to appellant having forsaken his family and that if he thought appellant was innocent he would have dismissed the indictment as he had done in other cases, any one of the other statements complained of, standing alone, might not have been prejudicial. But when the evidence is meager or so conflicting as to render the truth of it doubtful, the jury might easily be swayed or influenced by matters which otherwise might be harmless when the evidence is clear and convincing. Martin v. Com., supra. In view of the evidence in this case and the number of improper statements made by the Commonwealth Attorney, we think they were not only improper but prejudicial. Any man is entitled to a fair trial and to be tried for the offense charged in the indictment and upon the evidence of the witnesses alone. It is the privilege of the Commonwealth Attorney to state to the jury his interpretations of the evidence, but he should not go outside the record and inject into it evidence not testified to by the witnesses.

As we have already stated, we think the instructions were proper and the evidence sufficient to take the case to the jury; but since the case must be reversed upon the improper argument of the Commonwealth Attorney, we express no opinion as to whether the verdict is flagrantly against the evidence.

For reasons stated the judgment is reversed and remanded, with directions to set it aside and grant appellant a new trial and for proceedings consistent herewith.