THE STATE OF WYOMING,

*Plaintiff and Respondent*

vs.

FRANK KUMP,

*Defendant and Appellant*

(No. 2708; September 25, 1956; 301 Pac. (2d) 808)

For the defendant and appellant the cause was submitted upon the brief of Ernest L. Newton and L. A. Crofts, both of Lander, Wyoming, and Goppert & Fitzstephens of Cody, Wyoming, and oral argument by Mr. Ernest J. Goppert and Mr. Newton.

276

For the plaintiff and respondent the cause was submitted upon the brief of George F. Guy, Attorney General; Robert H. McPhillamey, Deputy Attorney General; Howard B. Black, Walter J. Muir, Arthur F. Fisher, Assistant Attorneys General; and W. A. Smith, former county and prosecuting attorney, and oral argument by Mr. Black and Mr. Smith.

## OPINION

BLUME, Chief Justice.

In this case the defendant Frank Kump was charged with murder in the second degree for killing Helen A. Kump, his wife, on February 20, 1954. He was convicted of manslaughter and sentenced to the penitentiary for a term of 8 to 12 years. From this conviction and sentence, he has appealed.

The defendant was born in Austria on December 24, 1900. He came to Shoshoni, Wyoming, in 1921, where he had a sister. He worked for a time for the Chicago and North Western Railroad and thereafter for some years on a ranch. About 1928, he bought what is called the Ollie Olsen place which was subsequently appropriated by the Government of the United States in connection with the Shoshoni Dam. The defendant married Helen A. Kump at Billings, Montana, in the fall of 1948 and they set up housekeeping on the Olsen place for a short time and then moved into a house in Shoshoni until they leased the so-called Griffin place. In 1951 they gave up the lease on the Griffin place and bought a ranch near Lander on Baldwin Creek known as the Meyers place, to which purchase Helen A. Kump contributed $1800 in cash and $1000 proceeds of an insurance policy. Soon thereafter they sold this place and bought a place in Missouri Valley, Fremont county, Wyoming, which was bought in the name of both. Everything they had was in their joint names, includ-

ing a bank account, except a pickup truck owned by defendant alone.

The defendant testified that on Friday, February 19, 1954, he went to a sale at Riverton, Wyoming. While there he engaged Dr. Robert E. Fuechsel, a veterinarian, to come out to his place the next day to look after a sick cow. He bought a half gallon of wine and went home about three o'clock in the afternoon. After he arrived home he and his wife had a drink of wine but got into some argument about the sale of the land. It seems much of the land was alkaline and defendant wanted to sell it. He told his wife he would sell it for $8000 but would take less if necessary. Helen A. Kump, the deceased, apparently did not want to sell the land for less and told him she would get a divorce if he sold the place as he said he was going to do. Just how much of the wine the defendant drank that night is not clear. Some of it apparently was left. When he got up on the morning of February 20, his wife was not there. She had taken the pickup truck and had gone to Riverton, Wyoming. Defendant stated he drank some of the wine on that morning and went to see George Bennett who lived in a sheep wagon about three-quarters of a mile from defendant in order to have Bennett help him feed his cattle. Defendant further stated that Bennett did help him and he and Bennett then went back to the sheep wagon; that Bennett gave him a quart of wine which he drank; that he stayed in the sheep wagon and did not know what happened after that time until he found his wife dead in his home. She was lying on a bed in the room which she occupied with a 25-20 Winchester carbine by her side. She had been shot through the heart. He then went to the Cunningham place where George Bennett stayed, in order to call the sheriff. They told him to go to the Schmidt place, which was about half a mile south of defendant's place, where

he called the sheriff and told him that his wife was dead. He also called other neighbors, the Griffins, who came over. He called the sheriff, as stated, about 5:30 p.m. on February 20.

George Bennett, mentioned above, testified at the preliminary hearing but had died before the trial of the case. His testimony at the preliminary hearing was introduced in the trial of this case. He testified in greater detail as to what took place on the afternoon of February 20. He did not state he had helped the defendant feed the cattle but he testified to the effect that defendant was drinking and was with him in the sheep wagon mentioned above. He stated he saw Mrs. Kump, the deceased, about two o'clock in the afternoon of February 20 at the Schmidt place when he and the defendant were driving past that place. He and defendant saw the pickup truck of defendant there; defendant then said his wife must be there, so they stopped. The witness got out and saw Mrs. Kump and told her that her husband was going home and asked her whether she was going home and deceased stated she might as well do so. Mrs. Kump drove on ahead in defendant's pickup. Witness and defendant followed. When they arrived at the Kump place they found the veterinarian, heretofore mentioned, who wanted the defendant to run the sick cow into the chute but defendant did not want to do so — apparently in poor condition to do it. Witness told the veterinarian to come back some other time. When the witness, the defendant and Mrs. Kump were all in the kitchen, the defendant acted like he was about half asleep. Mrs. Kump put her coat on a chair and did not take off her hat. The witness suggested that Mrs. Kump cook dinner and that the defendant would then be all right. She did so, but the defendant went to bed and would not eat. However, witness ate part of the dinner which

Mrs. Kump had prepared. He left about three o'clock in the afternoon and suggested to Mrs. Kump that when the defendant got up she should not argue with him. The witness next saw the defendant at the Cunningham place just before sundown when defendant stated his wife was dead and that there was a gun in the room. The witness and Schmidt accompanied the defendant to the Kump place and found Mrs. Kump dead. The witness saw the defendant again in the evening and stated that defendant acted as though he had "just come to."

The veterinarian testified he left the Kump place about two o'clock in the afternoon and that the defendant was then quite drunk.

The witness O. R. Britian saw the defendant at the Kump place about four o'clock in the afternoon of February 20. The defendant staggered out to the car and asked the witness for a drink. The witness told him he did not have any. Defendant then said, "Well, let us go get one." The witness said, "No, you ain't in no shape to go any place. You have had enough." The witness then drove away leaving the defendant. After that the only persons on the premises were defendant and deceased.

Dr. Bernard D. Stack, who drove out to the Kump place along with the sheriff and the deputy sheriff, arrived about eight o'clock on the evening of February 20. He testified that Mrs. Kump was shot through the heart and killed instantly between about four o'clock and five o'clock in the afternoon.

Mr. Robert M. Zimmers, an expert on ballistics, testified that the muzzle of the gun which killed the deceased was within an inch of the body of the deceased when the shot was fired and that no finger prints were

on the gun which was used to kill the deceased. Other facts will be mentioned later.

It is the contention of the defendant that he did not kill the deceased, and he so testified, and he further contends that she committed suicide.

1. Hearsay Evidence and Instruction.

The main contention made in this case is that five witnesses for the state were permitted to testify to statements made by deceased the evening previous to and on the morning of the day of the homicide; that these statements were all hearsay testimony and should not have been admitted. These witnesses are Bennett, Slagle, Parks, Winninger and Moran. We have heretofore set out the testimony of the witness Bennett. The objection made to his testimony is that he stated to the deceased not to argue with the defendant when he would get up. We can see no objection to this testimony. The defendant was drunk and the statement by Bennett was a natural statement made by anyone under these circumstances. Nor can we find any harm in the statement. It is objected also that the testimony of Slagle, the deputy sheriff, should not have been admitted. That testimony relates to a conversation and request of the deceased that he accompany her to her home at the ranch; that she did not want to go alone, and that she wanted him to accompany her. We see no objection to testimony of that sort. It was admissible if for no other reason than to show that she had no intention of committing suicide. The testimony of the other witnesses is of a different nature. Mrs. Parks testified that Mrs. Kump had told her that defendant had come home on the evening of February 19 with a bottle of wine, had drunk part of it and then stated, "I am going to get rid of you, if you don't leave, I'll kill you. I'll choke you to death. I'll give you $3000. I

will give you time to pack up your clothes and leave," that he had thrown a platter of eggs at her which hit the wall; that the deceased had also stated, "Frank, I am not leaving you. You are forcing me to go." The witness Mrs. Winninger was permitted to testify that the deceased stated to her that defendant had run her out and that defendant had thrown eggs at her. The witness Moran was permitted to testify that Mrs. Kump told him during the morning of February 20 that the defendant had threatened to kill her; that he was going to kill her by choking her, and that he had forced her to leave the place the preceding night, and that it was impossible to continue the marriage relationship. In other words, the nature of the testimony objected to is the testimony that the deceased was permitted to relate the hostile attitude of the defendant toward the deceased, including threats which the defendant had made against the deceased. At various times objection to this hearsay testimony was made by counsel for defendant. The attitude of the court in this connection is shown by the statement made by the trial court during the trial of this case as follows:

"I am going to sustain the objection as to statements made by the deceased at any time prior to within 24 hours of the time of the killing. Any statements, I believe, made by the deceased bearing upon the relationship between the parties to show their relationship and leading up to the events of the killing, I think, might be competent. I am going to let them in."
Again the court stated to one of the witnesses:

"You will testify only to what the deceased told you on the night before the day of her death. You may state what she told you."

In instruction 16 the court instructed the jury as to such testimony as follows:

"Certain witnesses have been permitted to testify during the trial of this case as to statements made to such

witnesses by the deceased within the twenty-four hour period preceding her death. The jury is reminded that the evidence shows these statements were not made in the presence of the defendant and were not made under oath and therefore such statements are not acceptable as evidence in a Court of Law for the purpose of establishing as true the facts related to such witnesses by the deceased, and such statements will be so regarded by the jury. The statements were admitted in evidence by the Court for the sole and only purpose of showing or tending to show the attitude of mind of the deceased *toward the defendant* at the time of her death and the jury will limit their consideration of these statements to this purpose." (Italics supplied.)

It may be noted the court shifted its position in this instruction from the thought expressed during the trial. In other words during the trial the testimony was admitted to show the relationship of the parties, but in the instruction it was limited to show the attitude of the mind of deceased toward defendant at the time of her death.

We know of no rule of law that statements of the deceased, of the nature above mentioned, made within twenty-four hours previous to the homicide are admissible in a case such as this. The attitude of the mind of deceased toward the defendant as evidenced by outward manifestations, such as declarations, is at times relevant when the defendant pleads self-defense. I Wharton's Criminal Evidence, 11th Ed., § 286. Knight v. State, 215 Miss. 251, 60 So.2d 638; Miller v. State, 9 Ga.App. 599, 71 S.E. 1021. In such case the attitude of mind is to show the *hostile* attitude of the deceased which would justify self-defense or perhaps reduce the degree of the crime, or the severity of the sentence. That is not the situation in the case at bar. The important fact here is the attitude of mind of the *defendant,* not that of *deceased.* The attitude of mind of the deceased toward the defendant was immaterial.

The instruction states an incorrect rule of law, although, it must be admitted it took some of the sting out of the admitted testimony.. The state has not attempted to defend the instruction, nor have we found any cases to sustain it. The state claims the statements of the deceased, showing a hostile attitude of the defendant, including threats, were admissible as part of the res gestae. So we shall turn to consider that matter, and we should do so in view of what has been said even if for no other purpose than that the Bench and Bar of this state may have a more correct view of the matter, although the limited time at our disposal does not enable us to go into the subject fully, and we must confine our discussion to the rule as applicable under the facts in this case.

6 Wigmore on Evidence, 3d Ed., § 1767, p. 182, states:

"The phrase 'res gestae' has long been not only entirely useless, but even positively harmful. It is useless, because every rule of Evidence to which it has ever been applied exists as a part of some other well established principle and can be explained in the terms of that principle. It is harmful, because by its ambiguity it invites the confusion of one rule with another and thus creates uncertainty as to the limitations of both. It ought therefore wholly to be repudiated, as a vicious element in our legal phraseology. No rule of Evidence can be created or applied by the mere muttering of a shibboleth."

Notwithstanding this statement, text books, encyclopedias, including Corpus Juris Secundum and American Jurisprudence, and cases continue to discuss what evidence is admissible under the theory of res gestae. 31 Yale Law Journal, p. 229, states that the term is used as a substitute for reasoning. In Carnes v. State, 14 Okl.Cr. 585, 179 P. 475, citing Price v. State, 1 Okl.Cr. 364, 98 P. 450, it is stated that 'as to

what constitutes res gestae is possibly the most complex and difficult question in criminal law.' See full discussion in 31 Yale L.J. 229; 12 Washington L.R. 91; 1 University of Chicago L.R. 394; 42 Illinois L.R. 88; 2 Kansas Law Review 41, 121, 246.

In 40 C.J.S. § 243, p. 1180, it is stated:

"As a general rule, statements and declarations by deceased are not evidence either for or against accused, unless they come within some of the recognized exceptions to the hearsay rule. Declarations of the victim before the homicidal act are admissible where they were so connected therewith as to form a part of the same transaction and illustrate and explain the killing."

See also 22 C.J.S. § 672, p. 1063. See the definition of res gestae in 1 Wharton's Criminal Evidence, 12th Ed., § 279.

In Montag v. People, 141 Ill. 75, 30 N.E. 337, 339, it is held that a statement made by the deceased fifteen minutes before the homicide and in the absence of the defendant, as to threats made by defendant, is not admissible as part of the res gestae. The court in discussing the subject before us stated as follows:

"The witness Ida Hoernffer was allowed to give a conversation she had with the deceased which occurred 10 minutes after defendant had left the store, and 15 minutes before he returned? 'Mr. Neely: What did deceased say to you after he had been out ten minutes? Answer. She told me that he warned her, if he couldn't come and see her that night, he would kill her. I ask her if she wasn't afraid, and she said, "No." ' Any declarations or threats that the defendant may have made were competent evidence against him; and, if the witness had heard the defendant make the statement which the deceased narrated to the witness, she might have given that statement to the jury. But the declaration was not that of defendant, but of the de ceased, and we are aware of no principle upon which

it was admissible, unless it was part of the res gestae. Anything said or done by the deceased or the defendant at the time of the homicide was competent as part of the act itself. 1 Greenl. Ev. § 108, says: 'The principal points of attention are where the circumstances and declarations offered in proof were contemporaneous with the main fact under consideration, and whether they were so connected as to illustrate its character.' And in the note to the text it is said:

'Declarations to become a part of the res gestae, must have been made at the time of the act done which they are supposed to characterize, and have been well calculated to unfold the nature and quality of the facts they were intended to explain, and to so harmonize with them as obviously to constitute one transaction.' See also, Weyrich v. People, 89 Ill. 96; People v. Carkhuff, 24 Cal. 640; Cheek v. State, 35 Ind. 492; Montgomery v. State, 80 Ind. 338; State v. Pomeroy, 25 Kan 349. Here the declarations of the deceased were made in the absence of the defendant. It is true he appeared 15 minutes after the declaration of the deceased, and committed the homicide, but if what the deceased said 15 minutes before is admissible as part of the act, upon the same principle what she may have said 6 hours or 24 hours before was also admissible. In Montgomery v. State, supra, in speaking in regard to the admission of dying declarations, the question under consideration is also discussed. It is there said:

'Matters which do not form part of the res gestae are not provable by dying declarations. The rule is confined to a statement of the circumstances connected with the fatal act, and forming a part of the same transaction, it is quite well settled that what occurs before or after the act has been done does not constitute a part of the res gestae, although the interval of separation may be very brief.' The same doctrine is announced in State v. Pomeroy, supra. * * * The testimony admitted was of the most damaging character. Here was a deliberate threat, made a short time before the shooting, to take the life of the deceased, and when this evidence was admitted for consideration of the jury, with the sanction and approval of the court, it doubtless had an important bearing on the minds of

the jury in determining the punishment that should be inflicted upon the defendant for the crime he had committed. Indeed, the evidence could not do otherwise than have a controlling influence with the jury."

In Holland v. State, 162 Ala. 5, 50 So. 215, 217, 218, it was held that testimony by the deceased of threats made by the defendant five minutes before the homicide was not admissible and was reversible error. The court in that case said:

"The conversation between the deceased and Annie Liggan before the killing, and while the defendant was absent from the house, was not admissible. Neither should the trial court have permitted Mrs. Taylor to testify that deceased told her, about five minutes before the difficulty, and before the defendant had returned to the house, that 'Holland told him he was going after a gun and was coming back to kill him, and that he could not defend himself.' This was all hearsay evidence and was not a part of the res gestae. State v. Stallings, 142 Ala. 115, 38 South, 261; Fonville v. State, 91 Ala. 39, 8 South. 688."

In the case of Fitch v. Commonwealth, 267 Ky. 646, 103 S.W.2d 98, a statement by the deceased tending to show the hostile relationship with defendant made a short while before the homicide was held to be error and the court should have promptly sustained the objection thereto.

In Adams v. Commonwealth, 274 Ky. 714, 120 S.W. 2d 237, 240, the wife was charged with the killing of her husband. A witness was permitted to testify that the deceased, the husband, had stated, " 'John, I am willing to support her, but I cannot live with her. She is dangerous, goes to sleep with a hammer under her pillow. I have never had any home life.' " The testimony was held to be incompetent.

In the case of Shoemaker v. Commonwealth, 218 Ky. 721, 292 S.W. 307, syllabus 1 of the case is as follows:

"In prosecution of three defendants for murder, admitting testimony of widow of deceased that deceased came into house and said defendants were after him to kill him, made in absence of defendants and 4 or 5 minutes before any shooting was done, held prejudicial error; testimony being incompetent."

See similar in effect State v. Beeson, 155 Iowa 355, 136 N.W. 317, Ann.Cas. 1914D, p. 1275; State v. Goodwin, 127 S.C. 107, 120 S.E. 496; People v. Creasy, 236 N.Y. 205, 140 N.E. 563; State v. Ridgely, 2 Har. & McHen., 1 Am.Dec. 372; Wooten v. State, 220 Ark. 750, 249 S.W.2d 968, 970; State v. Bigham, 133 S.C. 491, 131 S.E. 603. The cases on the subject are collected under the heading of "Homicide" in Century Digest § 349 and Decennial Digest § 169 (8).

It is said the approach of death produces a state of mind at which the utterances of the dying persons are to be taken as free from all ordinary motives to misstate facts. 5 Wigmore on Evidence, 3d Ed., § 1438. Yet it seems to be a universal rule that dying declarations tending to show the state of feeling that existed between the accused and the deceased prior to the homicidal act are not admissible. 40 C.J.S. § 300, p. 1279. That rule was approved by this court in the case of Foley v. State, 11 Wyo. 464, 72 P. 627, 630. The court stated:

"In Hackett v. People, (54 Barb. 374), one of the declarations was that the defendant had often threatened to kill the deceased. It was held to have been erroneously admitted, and the judgment was reversed upon that ground. In this case the dying declarations of deceased that he and defendant had had frequent quarrels, and that defendant had, in effect, challenged him to fight with pistols some days before the transaction which resulted in the killing, were clearly inadmissible; and, as they strongly tended to show malice and a motive for the killing, we cannot very well

see how the error could fail to prejudice the defendant's case."

If threats and hostile demonstrations, as related by dying declarations, are not admissible, as mentioned above, it would seem clear that they are not admissible where related by deceased prior to the homicide as in the case at bar. The inhibitions against stating falsehoods existing in the case of dying declarations would be much stronger than they would be in other cases.

Relationship of the parties may often be shown. 26 Am.Jur. § 321, p. 371. But whether that relationship may be shown by hearsay testimony is a different question. So the question of remoteness of testimony often arises in a criminal case, 22 C.J.S. § 639, p. 977, but that must not be confused with the question as to whether or not hearsay testimony is part of the res gestae. Declarations to be part of the res gestae must be substantially contemporaneous with the main fact — the homicide in this case — and must be so closely connected with it as to illustrate its character. State v. Stallings, 142 Ala. 112, 115, 38 So. 261; 6 Wigmore on Evidence § 1776; 1 Greenleaf on Evidence § 108. In Chicago City Ry. Co. v. Uhter, 212 Ill, 174, 72 N.E. 195, 199, citing Pennsylvania Co. v. McCaffrey, 173 Ill. 169, 50 N.E. 713, we find the succinct statement of res gestae to be: " 'That which occurs before or after the act is done is not a part of the res gestae, although the interval of separation is very brief.' " In the case at bar the threats and hostile attitude of defendant mentioned in the statements of the deceased the previous evening and the morning of the day of the homicide were not contemporaneous with the act of the homicide. They did not illustrate that act of homicide. The transactions, or acts, were entirely separate and distinct and were erroneously admitted in evidence.

## 2. Privileged Communications.

It is contended by the appellant that the testimony of the witness Moran should have been excluded for another reason than heretofor mentioned, namely, because Moran was employed by Mrs. Kump as her attorney, and that whatever she stated to him was a privileged communication. We find no merit in that contention. No authority has been cited to us sustaining it. The privilege of the witness is that of the client, and perhaps that of his heirs or representatives. 70 C.J. § 619, p. 456. "Privileged communications between attorney and client are excluded on the ground of public policy * * * and depends on the facts in each particular case." Underhill's Criminal Evidence, 4th Ed., § 333. We can conceive of no public policy which would exclude the communications such as are involved in this case, if otherwise admissible. Public policy would seem to require the communications to be admitted in evidence if relevant and not objectionable to the rule of hearsay.

## 3. Enlarged Photographs.

Complaint is made about the admission of photographs which were enlarged. We have looked at these photographs. They are not calculated to arouse passion or prejudice and we see no reason why they should not have been admitted in evidence. 32 C.J.S. § 709, p. 613; State v. Riggle, Wyo., 298 P.2d 349.

## 4. Suicide and Sufficiency of Evidence to Convict.

It is also contended that the evidence introduced in this case failed to exclude the reasonable hypothesis that deceased committed suicide and that the evidence is insufficient to convict the defendant. Facts to negative suicide are admissible in evidence. Commonwealth v. Howard, 205 Mass. 128, 91 N.E. 397; Commonwealth

v. Trefethen, 157 Mass. 180, 31 N.E. 961, 24 L.R.A. 235; Porter v. State, 86 Tex.Cr.R. 23, 215 S.W. 201; State v. Baldwin, 36 Kan. 1, 12 P. 318. In this case it appears the deceased drew $1900 out of the joint account at Riverton, and placed it in her personal account on the day of the homicide. She also rented an apartment for herself. She was afraid of guns. She did not want to go out to her home on the ranch except in company with someone else. When she got there, she kept her hat on and laid her coat on a chair. We think all of these facts tend to show she had no thought of committing suicide.

The defendant testified that his wife had lately been nervous and depressed, and had told him that she had the change of life, and complained of headaches. Dr. Replogle testified on the strength of that testimony, that the deceased might have had a suicidal complex. The jury were not required to credit the testimony of the defendant, and the doctor had never examined the deceased, and did not personally know whether or not she had such suicidal complex.

Counsel for appellant argue that the defendant was too drunk to have killed the deceased; that the deceased surely would have offered some resistance if defendant had assailed her, but that on the contrary the tidiness of the room showed there was no struggle of any kind; that the rifle with which she was shot was a short barreled rifle, enabling her to easily shoot herself; That in view of the course of the bullet she must have been standing when she was shot, and that the situation of the bed was such that no room was left for the person back of the carbine stock, enabling him to shoot her (which we doubt).

No one knows how drunk the defendant was, though he was doubtless drunk to some extent. The theory of

counsel for defendant is purely speculative. She may not have had, and probably did not have ,an opportunity to show any sort of resistance.

Dr. Stack testified that the deceased was probably killed between four and five o'clock of the afternoon of February 20. She was found lying on her back with most of her body on the bed, and with the gun lying on her right. The doctor testified that she had been turned over, and had been lying on her face at least thirty minutes. She could have been turned over only by the defendant, so that he waited at least thirty minutes before he reported her death. The total length of the gun with which she was shot was 37½ inches. The distance from the foot of the bed to the door was about four feet. There was space enough, with the defendant standing in the doorway to have shot her. As correctly argued by the state, and contrary to the contention of defendant, it would have been most difficult for the deceased to have shot herself, although, it is true, not impossible. The gun was kept in defendant's separate room, not in the room where the deceased was shot. The defendant was in his own room and it is not likely the deceased went into that room to get the gun during that time. The bullet was shot in a horizontal direction, so that the deceased must have been standing when she was shot. It is highly probable that if she had shot herself, she would have fallen "in her tracks," as the state argued, falling to the floor, with the gun also on the floor. Both the gun, as well as the body were probably moved after the deceased had died. We have examined the map and exhibits in evidence, as well as the testimony, with care, and without going into further details, we think it clear the jury were fully justified in finding that the deceased did not kill herself. The defendant and the deceased were the only persons about the premises when the deceased was

killed, so it is clear the jury were fully justified in finding that the defendant did the killing. That is further corroborated by the fact that no finger prints were found on the gun. The deceased could not have wiped them off. The inference is justified that the defendant did so.

5. Error Cured by Verdict.

The remaining question and the most important question herein is as to whether or not the admission of erroneous testimony mentioned above was reversible error, particularly in view of the instruction of the court limiting the force of it. The state contends that it is not; that since the jury convicted defendant of manslaughter only, he is in no way prejudiced. We think it clear as already stated that there was ample testimony to convict the defendant even though the testimony erroneously admitted had been excluded. We think another trial would result in again finding the defendant guilty of manslaughter. So we can see but little benefit to the defendant in sending the case back for a new trial. Error in the admission of evidence is frequently cured by the verdict. In this case the testimony, in regard to threats and hostile attitude of defendant as shown by the hearsay testimony heretofore mentioned, went to the point of malice and even premeditated malice, and it is quite clear the jury ignored that testimony when they found the defendant guilty only of manslaughter. It is stated in 24 C.J.S. § 1915, p. 981:

"So there is no reversible error where accused was acquitted of the offense with respect to which the improper evidence was admitted."
In the case of Little v. State, 130 Tex.Cr.R. 603, 95 S.W.2d 141, 142, the court stated:

"The testimony of the witness tended to support the theory of the state that, in shooting the injured party,

appellant was actuated by malice. The jury expressly found appellant guilty of assoult with intent to murder without malice and assessed the punishment at confinement in the penitentiary for one year. Under the circumstances, we are unable to reach the conclusion that the testimony of the witness could have injured appellant."

In the case of State v. Burnett, 226 S.C. 421, 85 S.E.2d 744, it is held that where a defendant was not convicted under a count charging intent to ravish, but only of assault and battery, and alleged inadmissible evidence pertained to intent, the defendant was not prejudiced. In State v. Bodie, 33 S.C. 117, 11 S.E. 624, it was held that one on trial for murder, the admission in evidence of the record of a prosecution for malicious mischief, instituted by deceased against defendant offered to show the feeling between the parties, if error, is harmless, where the defendant is convicted of manslaughter only, thus ignoring the question of malice. In Tyrrel v. State, 177 Ind. 14, 97 N.E. 14, it was held that the admission of testimony of similar offenses to show the intent charged in a prosecution for assault and battery with intent to rape was harmless error, where the verdict acquitted the defendant of the intent charged and found him guilty of assault and battery only. In Coulter v. State, 100 Ark, 561, 140 S.W. 719, it is held that where the accused was convicted of manslaughter only, error, if any, in admitting testimony that immediately after the killing he appeared at a church with two pistols, ordered the people out, and stated that he had shot deceased, was not prejudicial. The same holding is true when the defendant is charged with several counts but is acquitted of some of the counts and it is held improper admission of evidence of any count of which the defendant is acquitted is not reversible error. See People v. Harmon, 117

Cal.App.2d 511, 256 P.2d 340. See cases collected in Decennial Digest, Criminal Law, 1169 (6). The case of Crago v. State, 28 Wyo. 215, 202 P. 1099, is, we think, distinguishable from the case at bar. In that case the erroneous testimony went to prove the guilt of the defendant, while in the case at bar the erroneous testimony admitted tended merely to prove a higher degree of crime. We are not prepared to say the rule herein mentioned should be adopted in all cases but we think it is properly adopted in the case at bar, in which the jury were clearly justified in finding the defendant guilty of manslaughter, and in which the trial judge under our law fixes the punishment.

We are constrained under the foregoing authorities to hold that, in view of the fact the defendant was convicted of manslaughter only, the admission of hearsay evidence of threats and hostility, all showing malice, is not reversible error. The judgment of the trial court is accordingly affirmed. If, however, the trial court is of the opinion that the testimony improperly admitted may in any way have influenced the severity of the punishment imposed, it may, if it sees fit, cause the defendant to be brought before it and reduce the punishment as it may deem proper.

Affirmed.

Harnsberger, J., and Parker, J., concur.