STATE of Wyoming, Appellant
(Plaintiff below),

v.

Scott M. MOORE, Sr., and Scott M. Moore
Land and Livestock Company, Appellees
(Defendants below).

No. 2951.

Supreme Court of Wyoming.

Oct. 25, 1960.

Norman B. Gray, Atty. Gen., and W. M. Haight, Deputy Atty. Gen., for appellant.

E. E. Birchby and R. G. Diefenderfer, Sheridan, for appellee.

Before BLUME, C. J., and PARKER and HARNSBERGER, JJ.

Mr. Justice PARKER delivered the opinion of the court.

This is an action instituted by the State of Wyoming under § 9–688, W.S.1957, against Scott M. Moore, Sr., and the Scott M. Moore Land and Livestock Company, hereinafter called defendant,[1] for the escheat of 160 acres of land in Weston County.

The information[2] recited that in 1904 one Frank Dooley made a homestead entry on the land in question, now in possession of defendant; that in 1908 a patent issued from the United States to the "Heirs of Frank Dooley" and was duly recorded in Weston County; that said Frank Dooley (also known as Frank Durick) died intestate on March 29, 1904, leaving as his sole heir his brother, William Durick; that William Durick died intestate on April 7, 1948, leaving no heirs surviving him; and that the said land had been unclaimed for more than five years and should escheat to the State of Wyoming; and prayed for a decree setting the land over to the State.

Defendant answered, denying that the property should escheat to the State but admitting the other allegations of the information. It also alleged that defendant and its predecessors for many years (since about 1915) had been continuously in actual, open, notorious, and hostile possession of the lands, that it claimed title to them by adverse possession, and that they were not subject to escheat.

The court entered judgment for the defendant, finding that it had title to the land by adverse possession, that there was no right of escheat to the State of Wyoming at the time of the death of William Durick, and decreeing that the title be confirmed in the defendant against plaintiff; the State has prosecuted this appeal.

There does not seem to be much disagreement about the factual situation. David C. Norris testified that his father, James Norris, and a partner, Jim Stirling,

purchased all of the Michael Riordan land in 1915. The Dooley homestead in question here was adjacent to a portion of the Riordan land, and the witness testified it was considered by his father and Stirling to be a part of the property which they purchased although no deed was ever issued to them. The land was rough but had a spring which furnished the only stock water for a distance of some two miles. Although the homestead had been fenced at the time proof was made, Norris and Stirling refenced it within an enclosure of some two thousand acres. They used the property until they divided their holdings in 1932 or 1933, just before Stirling's death. According to the witness, at the time of the division the Dooley homestead was included in what his father "had in the Riordan land." James Norris died in 1934, and by court order the ranch went to two of his sons who later sold to Scott M. Moore, Sr., who in turn transferred to the Scott M. Moore Land and Livestock Company.

Scott Moore, Jr., told of the purchase of the Norris lands by his father, of the refencing of them with a 5-wire fence, of the building of a reservoir on the Dooley homestead, and of the use of the property by his father and the company since the time of the purchase.

By stipulation, a statement of the county treasurer was placed in evidence which purported to be a list of taxes assessed to the Frank Dooley heirs. This statement contained the notation, "1926–1904 No record"; was somewhat ambiguous as to the tax payments made between 1926 and 1930; showed "1931 Jas Stirling (Tax Sale)"; and from that time until 1958 showed payment by various persons, most of them defendant and its predecessors. Scott Moore, Jr., testified that the assessments were all made in the name of the heirs of Frank Dooley but the statements sent to the Dooley heirs in care of Scott Moore, Sr.

---

1. During the trial, it was stipulated that Scott M. Moore, Sr., was an incompetent and had no interest in the land; the case was dismissed as to him and proceeded solely against the company.

2. Section 9–688, W.S.1957, authorizes the filing of an "information" which is actually a "complaint" within the meaning of the Wyoming Rules of Civil Procedure.

The State's appeal is based upon three grounds: that the court granted relief not affirmatively pleaded or prayed for in its petition; that the court erred in admitting certain testimony prejudicial to plaintiff; and that there was no proper proof of all elements necessary to acquire title by adverse possession—defendant and its predecessors by actions, statements, and admissions being permissive users of the land and not entitled to ownership by reason of adverse possession.

## I

The State argues that the pleading and prayer are insufficient to support the judgment because there was no cross-claim seeking confirmation of defendant's title and no prayer requesting such relief. These contentions are correct, but no authorities are cited to indicate that this lack is fatal to the judgment. Accordingly, we make some analysis to determine the relief which could properly be granted under the pleadings as they were.

■ The effect of the allegation in the answer that defendant had been in adverse possession of the land since 1915 was essentially the same as that which would have been requisite in a proper cross-claim seeking title. Apparently the parties so considered the matter for the evidence which was taken related to acts claimed to show such adverse possession by the defendant and its predecessors. As Judge Clark indicated in Fanchon & Marco, Inc., v. Paramount Pictures, Inc., 2 Cir., 202 F.2d 731, 36 A.L.R.2d 1336, under Rule 54(c), Federal Rules of Civil Procedure, 28 U.S.C.A., the final judgment should grant all of the relief to which the plaintiff is entitled whether or not it has been demanded in the pleadings. Passing then to the prayer, it was most general, requesting dismissal of the action and "such other, further or different relief as may be just and equitable." It might be contended with some merit that such a prayer was broad enough to permit the relief which was granted, but the relief is not dependent upon a prayer. Even were this not true, it is a general rule that the prayer forms no part of the statement of a cause of action and is generally unimportant. Relief may be granted different from that in the prayer if it is justified by the allegations and proof. Bentley v. Jenne, 33 Wyo. 1, 236 P. 509. And see Samuels v. Singer, 1 Cal.App.2d 545, 36 P.2d 1098, 37 P.2d 1050; Estey v. Southwestern Gas Co., 129 Kan. 573, 283 P. 628; State ex rel. Coan v. Plaza Equity Elevator Co., 65 N.D. 658, 261 N.W. 46; 41 Am.Jur. Pleading §§ 110, 112, and 71 C.J.S. Pleading § 95.

## II

■ The argument as to improper admission of evidence centers on the following questions and answers:

"Q. Who was in possession of this Frank Dooley homestead at the time your father and Jim Sterling [sic] went into business up there? * * * A. It was Mike Riordan.

"Q. Up until the time that this action was started, had anybody ever taken any action or any steps of any kind to destroy the occupancy and holding of the ranch owners in this land? * * * A. No, sir."

It is contended in effect that the questions sought information which was properly for judicial determination and that the answers invaded the prerogative of the court. Further, counsel take issue with the ruling as to the second mentioned question, the court stating, "this is all part of the res gestae and gives the Court the picture of the whole transaction."

Considering the last argument first, we agree that the evidence should not have been admitted on the ground that it was a part of the res gestae, particularly because as is stated in 6 Wigmore, Evidence, 3d ed., p. 182, "The phrase 'res gestae' * * * is useless, because every rule of Evidence to which it has ever been applied exists as a part of some other well-established principle and can be explained in the terms of that principle." Additionally, the answers would not seem to fall within any reasonable definition of res gestae.

As to the principal point urged, it is well settled that as a general rule witnesses must state facts and not draw conclusions or give opinions, Union Pac. Ry. Co. v. Gilland, 4 Wyo. 395, 34 P. 953, and we think that in the present case counsel should have phrased his questions to obviate the objection that they called for conclusions. Nevertheless, there is much authority for the view that, where possession is not used in a strict legal sense and is merely intended to show who was physically present on the land or made use of it, a lay witness may testify as to possession. Adams v. Lamicq, 118 Utah 209, 221 P.2d 1037; Payton v. Madison, 251 Ala. 353, 37 So.2d 588. In any event, no direct authority is cited as showing that the questioning here was prejudicial and we doubt that it was. The same principle would reasonably apply to the second question asking about the action to destroy the occupancy and holding of the ranch. The argument at this time that the question called for hearsay and a conclusion of the witness may not be heard when such objection was not interposed at the time. Murdock v. State, Wyo., 351 P.2d 674; Murray v. San Leandro Rock Co., 111 Cal. App.2d 641, 245 P.2d 347. And see 3 Am.Jur. Appeal and Error § 353; 4 C.J.S. Appeal & Error § 248.

Turning then to the pivotal issue in the cause, we consider whether or not there was proof of all of the necessary elements of adverse possession. Plaintiff contends that the party relying upon adverse possession has the burden of proof,[3] and defendant agrees but insists that when the burden had been met by a showing of continuous, hostile possession of the land for more than ten years the burden then shifted to the State. We think that both contentions are correct. Thus, the cause turns upon the question, Were the acts of the defendant sufficient to constitute adverse possession under the law of this State?

We find no case which is identical to the one at bar and none substantially similar. There is, however, much helpful discussion, largely dicta, concerning adverse possession in the case of City of Rock Springs v. Sturm, 39 Wyo. 494, 273 P. 908, 97 A.L.R. 1, which deals with adverse possession resulting from a mistake as to boundary. There the city brought an action in ejectment to recover from Sturm a certain portion of a lot occupied by him. He testified that surveyors had told him the lot lines extended as far as the creek, and he thereupon built a fence and certain other improvements to that line and occupied the land for more than ten years. Some of the statements of Judge Blume which throw light on the present controversy are:

"* * * The specific character of possession necessary to make the bar effective is not specified, but courts have uniformly required it to be adverse, and have generally stated, as did this court in Bryant v. Cadle, 18 Wyo. 64, 104 P. 23, 106 P. 687, that, in order that possession may be adverse, it must be actual, open, notorious, exclusive, and continuous for the statutory period, hostile, and under color of title or claim of right. Courts are agreed that when actual possession is had, as in the case at bar, color of title is not necessary unless expressly required by statute. * * *" 273 P. at page 910.

"The main point in dispute herein is the point that has given rise to the greatest controversy in the law of adverse possession, namely, the rule that possession must be taken and held under a claim of right, or title, or ownership. The controversy has been fiercest in cases where possession of the land has been taken under a mistake, which, we may admit, as heretofore stated, was true in the case at bar. The contentions are perhaps not to be won-

3. Citing 2 C.J.S. Adverse Possession § 214.

dered at, for, in the absence of specific legislation on the subject, courts would naturally attempt to protect the title of the real owner on the one hand, and to protect a truly adverse possession for the period fixed by the statute on the other. It is admitted by the authorities that it is difficult, if not impossible, to reconcile the various holdings of the courts on this subject, although we are inclined to think that a greater uniformity, in results, at least, has been attained by the courts within the last few years. And it would seem to be true, as stated in the note to 33 L.R.A.(N.S.) 930, that 'the trend of opinion is against disturbing him whose visible boundaries have existed for the period of the statute of limitations, which is illustrated in many cases where the possession has been held sufficient.' " 273 P. at page 911.

" * * * the term 'claim of right' has been treated as the equivalent of a hostile claim. * * * The character of possession may give rise to a presumption, and it is generally held that the actual occupation, use, and improvement of the premises of the claimant as if he were in fact the owner thereof will, in the absence of explanatory circumstances showing the contrary, be sufficient to raise a presumption of his entry and holding as absolute owner, and, unless rebutted, will establish the fact of a claim of right. * * * " 273 P. at page 913.

As to the character of the possession of a person claiming adversely, 4 Tiffany, Real Property, 3d ed., p. 444, states:

" * * * an intention to appropriate [and hold the land as owner, and to the exclusion, rightfully or wrongfully, of everyone else] is no doubt necessary for the purpose of adverse possession, but this is, it is submitted, not because without it the possession would not be adverse, but because without it there would be no possession."

And at p. 445 goes on to say:

"As tending to negative any requirement of claim of right or title as necessary to put the statute of limitations in motion, reference may be made to the general acceptance of the view that, in the absence of an express statutory requirement to that effect, the statute will run regardless of whether the wrongful possession was taken under a bona fide claim of right. * * * "

In the present situation, the court made findings of fact that during 1915 Stirling and Norris entered upon the Dooley homestead and went into actual, open, notorious, exclusive, and hostile possession and that such possession had been maintained at the time of the suit by the successors in interest of these men; that they had fenced said land within an enclosure containing approximately two thousand acres belonging to them; that a reservoir had been constructed upon the lands by the occupants a number of years ago; and that defendant and its predecessors had paid the taxes since 1927. The court then found as a conclusion of law that the claim of right by reason of adverse possession vested in defendant's predecessors as early as January 1, 1926, and had passed by transfer to the defendants, and that there was no right of escheat in the State of Wyoming.

The uncontroverted evidence sustains the court on all factual findings, and is subject to challenge only on the question of the mental state of Stirling and Norris at the time they began to use the property. Plaintiff contends that theirs was a permissive use emanating from Michael Riordan who was administrator of the estate of Frank Dooley and therefore his was a fiduciary capacity. The record does not bear this out. The parties agree that Riordan was discharged as administrator in June 1908 (even before the issuance of the patent from the Government), and it is difficult to see how it could be logically contended that he was in a fiduciary capacity to the heirs of the deceased in 1915. What-

ever permission there was from Riordan could scarcely be said to be that of the Dooley heirs. There remains of course the question of the actual mental attitude. The evidence is undisputed that Stirling and Norris entered upon the land in 1915, thinking it was a part of the ranch acquired from Riordan, and that they and their successors in interest thereafter used the land exclusively and continuously until the date of the action. Their use was obviously notorious because it was well known and was clearly evident to anyone observing the fences.

In Pioneer Investment & Trust Co. v. Board of Education of Salt Lake City, 35 Utah 1, 99 P. 150, 152, it was said:

" * * * if a party places permanent structures upon the land belonging to another, and uses the land and structures the same as an owner ordinarily uses his land, then, in the absence of something showing a contrary intention, a claim of ownership may be inferred in favor of the party in possession. * * * "

In Walker v. Bowen, 333 Mich. 13, 52 N.W.2d 574, it was held that when the possession of realty is by actual occupation the possession is visible, open, notorious, distinct, and will be presumed to be hostile.

In Clayton v. Reamer, Tex.Civ.App., 153 S.W.2d 1020, it was held that when a person in possession of land is shown to have used and enjoyed it as the owner of land usually does the natural inference is that his possession was taken and held by himself as owner, and this inference prevails unless something else is shown to qualify and explain the possession.

See Smith v. Badura, 70 Or. 58, 139 P. 107, where the land was fenced and improved, the court stating that this indicated an intention to claim the title adversely, thereby raising a presumption of a claim of right or title.

In the present case defendant and its predecessors in interest fenced the land and for over forty years used it as if it belonged to them, and plaintiff presented no evidence which qualified or explained the necessary inference that the possession was hostile to that of the Frank Dooley heirs.

Plaintiff argues that there can be no adverse possession against the State but overlooks the fact that the State had no claim of interest in the property until long after the statute of limitations had run.

The judgment is affirmed.