Arthur M. ARMSTRONG, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 91–72.

Supreme Court of Wyoming.

Feb. 27, 1992.

Leonard D. Munker, State Public Defender and David Gosar, Appellate Counsel, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia L. Hackl, Deputy Atty. Gen., Jennifer L. Gimbel, Sr. Asst. Atty. Gen., and D. Michael Pauling, Asst. Atty. Gen., for appellee.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

URBIGKIT, Chief Justice.

In this appeal after a homicide conviction, appellant contends he was denied a fair trial because the State was allowed to ask an improper question calling for a legal conclusion and the legal conclusion was then repeated accompanied by an improper prosecutorial victim-impact comment during closing argument. Appellant also argues inadmissible hearsay was used against him at trial and, finally, that he was deprived of a fair trial by the trial court's refusal to grant a change of venue after the dissemination of prejudicial publicity by local media. We conclude that appellant did receive a fair trial consistent with due process and affirm his first degree murder conviction and life sentence.

## I.

## ISSUES

Appellant presents four issues for consideration:

ISSUE I

Was the appellant denied his right to a fair trial when the state was allowed to ask a question which called for an answer in the form of a legal conclusion?

ISSUE II

Was the appellant denied his right to a fair trial by the improper comments made by the state's attorney during closing arguments?

ISSUE III

Was the appellant denied his right to a fair trial by the repeated use of inadmissible hearsay in the state's case in chief?

ISSUE IV

Was it an abuse of discretion not to grant appellant's request for a change of venue?

The State presents the issues in different terms:

I. Was appellant properly permitted to testify to factual matters within his personal knowledge?

II. Did the prosecutor's closing argument, characterizing certain defense evidence as insignificant and requesting a

verdict consistent with the state's evidence, deprive appellant of a fair trial?

III. Did the admission of relevant, non-hearsay evidence deprive appellant of a fair trial?

IV. Was appellant entitled to a change of venue, in light of the negligible effect of pre-trial publicity on the jury?

## II.

### FACTS

Appellant, Arthur M. Armstrong (Armstrong), admits he fired the gunshot that killed David Anastos (Anastos or victim) at the Ponderosa Bar (Ponderosa) in Green River, Wyoming. Viewed on appeal in the light most favorable to the State, the series of confrontations that culminated with the shooting began during the late afternoon and early evening of Sunday, July 29, 1990. *Griffin v. State*, 749 P.2d 246 (Wyo.1988). Armstrong drove his friend Bobby Nelson, a/k/a Bobby Eagle (Nelson) to the Ponderosa. With another acquaintance they met at the bar, an evening's drinking began.

Anastos and his girlfriend Rachelle "Shelly" Mandros (Mandros) also arrived at the Ponderosa during the late afternoon to play pool and drink. While engaged in a game of pool, Anastos used several invectives. The bartender, Tracy Roberts (Roberts), repeatedly told Anastos to "watch his mouth." Eventually, Armstrong told Anastos, "[t]he lady asked you once to watch your language, so why don't you listen." Anastos urged Armstrong to "take his best shot." Roberts told Armstrong to sit back down at the bar. Armstrong complied; however, hostility between the two men increased when Armstrong told Anastos to leave the bar. Mandros urged Anastos to leave, but when he continued playing pool, she left to go to another bar in the neighborhood.

Anastos stayed to drink and visit with others he knew. Later, Anastos offered to buy Armstrong a drink and said, "let's be friends." Armstrong told Anastos to get away and stay away. When Anastos refused, Armstrong got off his bar stool and took a swing at Anastos. The confrontation ended with Armstrong on the floor after some shoving and with Armstrong telling Anastos, "[y]ou got me by 31 years or so." A friend of Anastos', Lois Muckley, walked over and took Anastos to another portion of the bar.

The tension between the two men escalated once again. After further verbal exchanges and more shoving, Armstrong ended up on the floor again with witnesses reporting that Armstrong was breathing hard and rubbing his chest and leg. Roberts thought Armstrong, who had a history of heart problems, might be suffering a mild heart attack. Armstrong threatened Anastos saying, "I'll see you dead before I die," and "[n]o punk kid's going to get the best of me." After being helped to his feet, Armstrong sat down to regain his breath. He left the bar a short time later.

Armstrong testified he left the bar to change his torn shirt. Roberts, the bartender, said that Armstrong left expressing anger that Anastos had ripped the shirt. Armstrong told Roberts he would be right back. Roberts expressed concern that Armstrong had left to get a gun. Anastos refused to leave the bar prophetically boasting, "[i]f he [Armstrong] wants to come and shoot me, let him." Anastos joined Gary and Lois Muckley at the end of the bar for a drink.

About fifteen minutes later, Armstrong returned to the bar. Armstrong testified he returned to pick up his friend Bobby Nelson.[1] Roberts saw Armstrong drive up to the bar's parking lot and yelled to Armstrong, "[i]f you come in here, Art, I don't want no trouble." Armstrong assured her that he intended no trouble. Armstrong walked past Anastos and sat down while ordering a drink. Anastos made no statements or gestures to Armstrong during this time.

As Roberts turned to fix the drink, Armstrong got off his bar stool, drew a hand-

---

1. Nelson had stayed at the Ponderosa for only a short time after they arrived. He left telling Armstrong he was going to another bar in the neighborhood. Nelson was unavailable to testify at Armstrong's trial because he had died in a fire.

gun from his boot and started walking toward Anastos. A customer at the opposite end of the bar, Keith Phillips, heard Armstrong say loudly, "I'm going to get that son of [a] bitch." Lois Muckley saw the weapon and screamed, "he's got a gun." Anastos jumped up and took a step back from the bar. Armstrong fired one shot.

After the shooting, Armstrong laid the gun on the bar and pushed it away. As Armstrong then lit a cigarette, Gary Muckley heard Armstrong say, "I did what I had to do." Gary Muckley used a table knife to pick up the gun and put it behind the bar. While Roberts called the police, Gary Muckley determined that Anastos was unconscious and bleeding from a head wound. Gary Muckley yelled that Anastos was still alive and Armstrong responded, "[l]et me have the gun back, and I'll finish the bastard off." At trial, Armstrong denied making the statement, but admitted he sat waiting for the police to arrive.

Anastos died the following day in a Salt Lake City, Utah hospital. Autopsy results showed Anastos died from a gunshot wound to his right temple. The autopsy also revealed Anastos had used a very high level of cocaine before his death.

Armstrong was charged with first degree murder under W.S. 6–2–101 (1991).[2] At his arraignment, Armstrong was informed his maximum sentence possibility would be life in prison. He entered a plea of not guilty, followed by a motion for a change of venue under W.R.Cr.P. 23 with the contention that there had been "pervasive, protracted and prejudicial publicity in this case" which poisoned the minds of local citizens. The trial court denied the motion with a finding that Armstrong had failed to show it was impossible to seat a fair and impartial jury in Sweetwater County, although agreeing that jury selection in Sweetwater County could take more time due to the publicity about the barroom killing.

At trial, Armstrong relied on evidence of the victim's cocaine use and a self-defense theory to argue that the victim's aggressive behavior threatened Armstrong's heart condition. In disbelief of Armstrong's self-defense theory, the jury rendered a verdict of first degree murder resulting in the mandatory sentence of life imprisonment. W.S. 6–2–101(b) (1991).

### III.

### TRIAL ISSUES

#### A. *Legal Conclusion Used For Cross-Examination*

Armstrong contends the trial court erred in allowing the prosecutor to ask him questions designed to elicit a legal conclusion during cross-examination. Armstrong also argues that the prosecutor improperly used the testimony during closing argument. The colloquy produced this exchange:

Q. [PROSECUTOR]: This is fair to say, isn't it, Mr. Armstrong, that during the course of the evening, you became very angry at David Anastos?

A. [ARMSTRONG]: Yes.

Q. It's fair to say that you had ill will towards David Anastos, isn't it?

A. Yes.

Q. It's fair to say that you felt malice towards David Anastos, isn't it?

[DEFENSE COUNSEL]: Your Honor, I'll object to that question. That's a determination to be made by the jury.

[PROSECUTOR]: I believe the witness is capable of answering whether or not he felt that way.

COURT: Overruled. You may answer.

A. [ARMSTRONG]: I had—at times, I was—I felt malice.

Q. [PROSECUTOR]: Once you became angry at David, you never made up with him? You guys never made

---

**2.** W.S. 6–2–101 provides:

 (a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate, any sexual assault, arson, robbery, burglary, escape, resisting arrest

or kidnapping, kills any human being is guilty of murder in the first degree.

 (b) A person convicted of murder in the first degree shall be punished by death or life imprisonment according to law[.]

amends or made up with each other, did you?

A. No.

█ The conduct of the cross-examination of a testifying defendant in a criminal trial is subject to the wide discretion of the trial court in determining the admissibility of evidence. *Grabill v. State,* 621 P.2d 802 (Wyo.1980). On appeal, the trial court's discretionary ruling on evidence will not be upset absent a clear abuse of discretion. *Nimmo v. State,* 603 P.2d 386 (Wyo.1979). The appellant has the burden to demonstrate that an abuse of discretion exists. *Jahnke v. State,* 682 P.2d 991 (Wyo.1984). Abuse of discretion was defined in *Martinez v. State,* 611 P.2d 831, 838 (Wyo. 1980):

A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did. An abuse of discretion has been said to mean an error of law committed by the court under the circumstances.

In *Martin v. State,* 720 P.2d 894, 897 (Wyo.1986), this court said:

Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.

Armstrong presents a contorted, mechanical syllogism urging this court to consider the accused's testimony to be that of a lay expert. According to Armstrong, an expert is not allowed to offer opinions embodying legal conclusions even under the broad language of W.R.E. 704.[3] Armstrong testified that he felt malice. Therefore, Armstrong says he improperly testified as to a legal conclusion. The logic fails at the minor premise. First, Armstrong was not offering a legal opinion, he was testifying as to his factual recollection of personal feelings involving anger toward the victim. Second, the term "malice" in ordinary meaning as used in the context of the testimony and closing argument did not embody a legal conclusion.

█ A witness, lay or expert, is not permitted to articulate an opinion as to the guilt of the accused under W.R.E. 704. *Stephens v. State,* 774 P.2d 60 (Wyo.1989). The obvious reason is that opinion testimony about guilt or innocence does not address areas that assist the jury in resolving factual issues. *Bennett v. State,* 794 P.2d 879 (Wyo.1990). Ultimate issues to be determined by the jury are not properly the subject of expert testimony. *State v. Walters,* 120 Idaho 46, 813 P.2d 857 (1990). The question that elicits the opinion testimony must be phrased to ask for a factual rather than a legal opinion. *People v. Collins,* 730 P.2d 293 (Colo.1986).

█ Armstrong testified voluntarily in an effort to show he acted in self-defense. In Wyoming, a defendant who has voluntarily testified as a witness may be cross-examined the same as any other witness and the latitude of cross-examination is largely within the discretion of the trial court. *Roby v. State,* 587 P.2d 641 (Wyo. 1978); *Porter v. State,* 440 P.2d 249 (Wyo. 1968). Armstrong claimed he fired the fatal shot to stop Anastos from beating him again. The State was entitled to refute Armstrong's claim of self-defense during cross-examination. *Yarbough v. State,* 753 S.W.2d 489 (Tex.App.1988). The homicide defendant who testifies in his own defense may be asked about his motive or intent in firing the fatal shot. *Meldrum v. State,* 23 Wyo. 12, 146 P. 596 (1915); *Patterson v. State,* 156 Ala. 62, 47 So. 52 (1908).

The prosecutor's questioning reviewed Armstrong's actions during the evening and his thoughts about returning to the bar. The questions about anger, ill will and malice were clearly directed at ascertaining Armstrong's intent. Armstrong

---

**3.** W.R.E. 704 provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

was not offering a legal opinion, he was stating that on the evening of the shooting, he felt anger, ill will and "malice" toward the victim.

Armstrong attempts to support his argument that the malice questioning was inappropriate by reference to inapposite federal decisions ruling on the propriety of specific questions. For example, in *Torres v. Oakland County*, 758 F.2d 147, 151 (6th Cir. 1985), the court determined that questioning whether someone had been discriminated against because of her national origin called for an improper legal conclusion because "discrimination" had a specialized meaning under the law. The witness's opinion was considered not helpful under F.R.E. 701.[4] However, the court also ruled the error was harmless. *Torres*, 758 F.2d at 151. Conclusionary questions characterizing someone's memory as "not 'good'" or asking whether admitting possession of guns would be highly relevant in another pending case were limited in *United States v. Carr*, 584 F.2d 612, 617 (2nd Cir.1978), *cert. denied* 440 U.S. 935, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). A government expert's testimony in a securities fraud and conspiracy prosecution that included repeated references to the "manipulative and fraudulent scheme" or "fraudulent manipulative practices" was found inappropriate in *United States v. Scop*, 846 F.2d 135, 138–39, *reh'g* 856 F.2d 5 (2nd Cir.1988). The court noted that the expert did not attempt to present a factual statement, but rather used the language of the statute and regulations to indicate guilt. *Id.* at 140, 142.

Armstrong also relies on the analysis of *United States v. Baskes*, 649 F.2d 471 (7th Cir.1980), *cert. denied* 450 U.S. 1000, 101 S.Ct. 1706, 68 L.Ed.2d 201 (1981). However, a careful reading of the case shows the reliance to be misplaced where the court decided under F.R.E. 701 that questions to an indicted co-conspirator by another co-conspirator's defense attorney were not helpful. *Baskes*, 649 F.2d at 478. The

defense counsel asked the witness twice if he "unlawfully, knowingly and wilfully" conspired to defraud the United States of America. *Id.* The court noted the questions were not addressed to any factual matter; rather, the questions addressed only the legal implications of the conduct. *Id.* The *Baskes* court did not address the specific admissibility of the questions under F.R.E. 704. Instead, the court noted that it had found that the question was not "otherwise admissible" relying on F.R.E. 701. *Baskes*, 649 F.2d at 479.

Unlike *Baskes* and the other cases Armstrong offers, the questions answered by Armstrong directly probed factual matters. Armstrong was not offering an opinion. Instead, Armstrong responded to questions addressed to his recollection on the night of the shooting. The prosecutor's questions did not seek an improper legal conclusion from Armstrong.

**B.** *Closing Argument—Legal Conclusion*

■ At the core of his argument, Armstrong wrongly implies that prejudice occurs automatically when a term is used in a question or argument which may have a legal meaning. Armstrong bolsters this contention by claiming that the prosecutor's cross-examination and the closing argument confused the legal and common meaning of the word "malice" leaving the jury with the impression that Armstrong admitted malice. W.S. 6–2–101(a) (1991). During closing argument, the prosecutor reviewed the evidence in the context of the elements of first degree murder, including malice:

What about malice? Now, this would apply to First Degree Murder. It's also, as I mentioned, an essential element in Second Degree Murder. First off, I guess foremost, I asked the Defendant in the first place, did you feel malice in your heart, did you feel malice towards

---

**4.** F.R.E. 701 and W.R.E. 701 are essentially identical. W.R.E. 701 provides that "[i]f the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue."

David that night. His answer was yes. Malice is defined for you as well. That is Instruction 13. " 'With malice' means the commission of a wrongful act done intentionally without legal justification or excuse. The term malice conveys the meaning of hatred, ill will, or hostility towards another and implies a wicked condition of mind." When I asked the Defendant if he had ill will towards David, he said yes. When I also asked the Defendant whether he felt hostility towards the deceased—rather, David, he said yes. So the Defendant has told you directly and indirectly that he felt malice. Malice was present.

But again, you have to look at all the other facts and circumstances surrounding the killing on that evening, and you also—I would ask you to consider Instruction 27. [The judge] has instructed you that the law requires that all elements of an offense, including malice, must be proved beyond a reasonable doubt, however, the element of malice may be inferred by the jury from use of a deadly weapon in a dangerous and deadly manner if the facts and circumstances so allow. The very fact that the Defendant used a .38 on David Anastos is a fact that you can—from which you can infer malice. That is evidence of malice.

What about the Defendant's reaction according to all the testimony that you heard of several witnesses when David wanted to make up? When David was making friendly gestures and peace gestures, and the Defendant's reaction was "Get the hell away from me" or always some statement of anger and hostility. That is very clear evidence of the malice that the Defendant felt towards David Anastos that evening. He expressed it

that night in no uncertain terms. The very same thing applies when David made a similar peace gesture, offered his hand to help pick him up. The Defendant denies that. Everyone else who was there remembers that. Everyone. That is evidence of malice.

What about the words that the Defendant was using that night according to all the witnesses, other than himself, to describe David. Well, when you call someone a SOB, when you call somebody a punk-ass kid, those are certainly not terms of endearment. Those are expressions, ladies and gentlemen, of malice, ill will.

The argument used the definitions of "with malice" and "malice" which were contained in the jury instructions and were unchallenged. The prosecutor also carefully noted that the jurors were required to look at all of the facts. He pointed out that the jury could infer malice from the use of a gun. *Braley v. State,* 741 P.2d 1061 (Wyo.1987). No objections were offered to this argument at trial; therefore, only plain error would require reversal. *Jeschke v. State,* 642 P.2d 1298 (Wyo.1982). It is also clear that the jury had sufficient opportunities to find malice even without considering Armstrong's testimony. The jury could consider and no doubt find that the shooting was not friendly, but instead a malicious act of anger.

■ The use of a term which may have a legal meaning and a common meaning does not create automatic prejudice.[5] While common sense would urge practitioners to phrase questions to obviate possible objections and subsequent appeals, there is authority that when a term is not used in its strict legal sense, the question may be allowed at the trial court's discretion. *State v. Moore,* 356 P.2d 141 (Wyo.1960).

**5.** *See State v. Dubina,* 164 Conn. 95, 318 A.2d 95, 99 (1972), where the defendant was asked by the prosecutor: " 'Why is it necessary to interpose a defense of insanity to both kidnapping and rape, if you deny it? Isn't [that] inconsistent?' " After an objection was overruled, the defendant answered he did not think the two defenses were inconsistent. The Connecticut Supreme Court ruled no abuse of discretion occurred in allowing this question.

Confusion can develop between the concept of malice as a factual characterization of a person's feelings and a legal term emplaced in a homicide statute. See the discussion of malice in Perkins, *A Rationale of Mens Rea,* 52 Harv. L.Rev. 905 (1939) and Perkins, *A Re-Examination of Malice Aforethought,* 43 Yale L.J. 537 (1934). Consequently, its use in examination is not recommended; albeit here, not determined to be prejudicial error.

Malice in general usage and in statutory application carries a definition in Wyoming which traces to Justice Blume's opinion in *State v. Sorrentino*, 31 Wyo. 129, 224 P. 420, *reh'g denied* 31 Wyo. 499, 228 P. 283 (1924). Justice Blume noted that what constitutes malice is not easily defined. Nevertheless, the court adopted a definition of malice which in substance remains today:

"Malice means ill will, hatred, ill-natured, wilfulness, a willful intention to do an unlawful act; a willful act done intentionally without just cause or excuse. It also denotes a state of mind from which acts are done regardless of others." * * * In its popular sense, the term malice conveys the meaning of hatred, ill-will, or hostility toward another. * * *

"The legal import of the term 'malice' extends beyond and is more comprehensive than ill-will, hatred or revenge. It includes all states of the mind under which the killing of a human being by another takes place without any cause which will in law justify or excuse it or *mitigate* the homicide to manslaughter."

*Id.* 31 Wyo. at 139–40, 224 P. 420 (emphasis in original and quoting *Meldrum*, 146 P. at 603 and *Bennett v. State*, 15 Ariz. 58, 136 P. 276, 277 (1913)). The passage of six decades has failed to endow our language with suitable synonyms.[6] In the present case, the trial court decided that the prosecutor's question did not ask for legal application and permitted reference to the testimony during closing argument. Since that ruling does not represent an error of law, plain error did not result. *Benson v. State*, 571 P.2d 595 (Wyo.1977); W.R.Cr.P. 49(b).

### C. *Further Prosecutorial Misconduct During Closing Argument*

Armstrong also challenges portions of the prosecutor's closing argument as being extraneous and designed to inflame the passions of the jury. During the final portion of closing, the prosecutor discussed the introduction of evidence that the victim had used cocaine prior to the shooting.

The prosecutor refuted the testimony of Armstrong's toxicology expert, Dr. Dale Wingeleth, who offered his opinion that the cocaine and alcohol in Anastos' system would have made his behavior erratic, nervous, anxious and paranoid. The prosecutor said cocaine was not a factor in Armstrong's actions, instead Armstrong shot the victim as a result of injured pride and a bruised ego. The prosecutor then asked rhetorically: "So why did we spend all that time with cocaine?" He argued that it may have been an attempt to see the victim in a negative light so the crime would seem less of a crime. At one point, the prosecutor argued that the jury should not accept the "twisted logic" advanced by Armstrong because it would be a disservice to the victim and his parents and family who still grieve the loss of their relative. No objection was made by Armstrong's trial counsel to this argument. Instead, Armstrong's trial counsel adopted the same rhetorical question in his closing to assert that the prosecution had attempted to block the introduction of the cocaine testimony to stop the defense from arguing that the victim was threatening Armstrong at the time of the shooting. During rebuttal, the prosecutor responded:

[Defense counsel] asked you, and I guess it was a rhetorical question, why did the State fight so hard to keep the cocaine evidence out, why did the State object to this and that, breathalyzer? Well, your instructions say—I believe this is either Instruction No. 2—or Instruction No. 2, you're not to speculate about the purpose for why something is objected to or why the—what the ruling is or why. That's for the Court to do. You're instructed to that very specifically in these written instructions, but since he's asked the question, why didn't we want the cocaine to come in, maybe the answer is that we didn't think it had anything to do with this case other than to put David Anastos's family through another ordeal having to hear that type

---

**6.** Roget's lists only three: enmity, hate and maliciousness. Roget's International Thesaurus

1067 (4th ed.1977).

of evidence and having their dead son put on trial, or their dead family member.

No objection to this presentation was offered. Armstrong now claims he was deprived of a fair trial by the prosecutor's comments.

Armstrong also challenges specific comments of the prosecutor during rebuttal that referred to the jury's obligation to seek justice. The prosecutor told the jury they should hold Armstrong fully accountable for his actions in coldly killing another human being.[7] Armstrong contends the argument instructed the jury that they were abrogating their duty if they did not return a conviction. Armstrong further suggests the prosecutor improperly implied that the defense strategy was not to present the truth, but to divert the jury's attention from the facts.

 In review, this court considers the prosecutor's argument in its entirety, not just the sentences and phrases taken out of context. *Wheeler v. State*, 691 P.2d 599 (Wyo.1984). A party alleging prosecutorial misconduct has the burden of proving that substantial prejudice has occurred. *McLaughlin v. State*, 780 P.2d 964 (Wyo. 1989). The general rule in Wyoming is that a failure to interject a timely objection to an allegedly improper argument is treated as a waiver, unless the misconduct is so flagrant as to constitute plain error and require reversal. *Jeschke*, 642 P.2d at 1301. The plain error doctrine requires the appellant demonstrate that a clear and unequivocal rule of law has been violated, that he was denied a substantial right and, as a result, has been materially prejudiced. *Barela v. State*, 787 P.2d 82 (Wyo.1990). "For the purpose of review under the plain error standard, the limit on argument by the prosecutor is exceeded if the prosecutor's argument states or implies that the jury should consider factors other than the evidence presented in determining the facts." *Id.* at 84.

 The guiding principle in prosecutorial responsibility was recently well restated by the West Virginia court in *State v. Hays*, 408 S.E.2d 614, 624 (W.Va.1991):

"Great latitude is allowed counsel in argument of cases, but counsel must keep within the evidence, not make statements calculated to inflame, prejudice or mislead the jury, nor permit or encourage witnesses to make remarks which would have a tendency to inflame, prejudice or

---

7. After discussing Armstrong's failure to prove that he acted in self-defense, the prosecutor stated:

Ladies and gentlemen, all of us have probably during our lives heard about other crimes as serious as this one or more serious. Some of us may have had the thought something ought to be done about that, or I hope something is done about that. You 12 people are the only ones who have the power to do something about what happened in the Ponderosa on July 29th. Only you have the power to do justice in this case. That's one thing I agree with [defense counsel] on. Your duty is to do justice and to seek relief.

You might ask yourself when you get back and start deliberating, does it really matter if we just pick First Degree Murder or Second Degree Murder or even Manslaughter? Well, you have a duty to do what the evidence shows, and I'll submit that all the elements of the First Degree are present, including specific intent.

I'm sure that you'll take your duties as jurors seriously, and I know that all of you when you look back at this experience, whether that be tomorrow, next year, or years from now, you'll want to look back with the confidence and knowledge that you did the right thing, you did your job, and you did your duty, and you did the right thing. You will set a standard by your verdict. Make sure in your minds and hearts it's the correct standard.

Your verdict should speak the truth. You should send a message with your verdict. That message in part should be in Sweetwater County and in Wyoming, if you coldly kill a fellow human being without justification and with premeditation and malice, you'll be held fully accountable. Your crime won't be compromised or reduced to Second Degree Murder or Manslaughter. You'll be held fully accountable for what you did.

As I leave this case with you, I ask each of you as individuals and you the jury collectively as one body to do the right thing; to hold this Defendant fully accountable for what he did. He is the person who put himself in this position. It's not your responsibility, it's not any of our responsibility. He is responsible for what he did on July 29th. Hold him fully responsible and accountable. What he did, as the evidence shows, is First Degree Murder, plain and simple. Thank You.

mislead the jury." Syl. pt. 2, *State v. Kennedy*, 162 W.Va. 244, 249 S.E.2d 188 (1978).

Where objection is not made, the standard for review is whether there was a substantial risk of a miscarriage of justice. *Com. v. Haskins*, 411 Mass. 120, 578 N.E.2d 788 (1991).

In presenting closing argument, the prosecutor is entitled to reflect upon the evidence and to draw reasonable inferences from that evidence in order to assist the jury in its function. *Jeschke*, 642 P.2d at 1301–02. Argument designed to appeal to the juror's passion or prejudice is improper; however, the scope of permissible argument as well as the injury caused by misconduct are best determined by the trial judge. *Hopkinson v. State*, 632 P.2d 79 (Wyo.1981), *cert. denied* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982). The first responsibility for the deterrence of contended improper conduct of the prosecutor belongs to the appellant's trial counsel. *Barela*, 787 P.2d at 85, Urbigkit, C.J., specially concurring.

Considered as a whole, the prosecutor's closing argument did not result in material prejudice to Armstrong. The evidence of the victim's cocaine use was an integral component of Armstrong's self-defense theory. The prosecutor's refutation dealt primarily with the distinctions between the toxicology expert's testimony on a cocaine user's pattern of behavior and the pattern of behavior eyewitnesses observed from the victim prior to the shooting. The prosecutor's use of a "storybook" metaphor to refer to the toxicology expert's exemplary behavior analysis may seem indistinguishable to Armstrong; but, it was not prejudicial.

The prosecutor's suggestions that he fought to keep the cocaine evidence out to prevent another ordeal for the victim's family constituted error although harmless. *Justice v. State*, 775 P.2d 1002 (Wyo.1989). While unnecessary to establish the elements of the crime, the comments were not addressed to the jury in a manner calculated to request the jurors ignore the evidence. Consideration of victim-impact testimony or argument remains inappropriate during proceedings determining the guilt of an accused. *See Payne v. Tennessee*, —— U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720, *reh'g denied* —— U.S. ——, 112 S.Ct. 28, 115 L.Ed.2d 1110 (1991). This case was not as close as Armstrong contends and the prosecutor's comment did not rise to the level of plain error requiring reversal. *Jeschke*, 642 P.2d at 1302–03.

The prosecutor's reference to the jury's duty to perform justice was not prejudicial. The prosecutor asked the panel to consider the evidence and reminded the jury that their service is a public duty. Wyoming law acknowledges the public obligation which juries perform:

> The penalties assessed against criminals are intended not only as punishment for the particular crime, but also as examples to deter others from the commission of similar offenses. There is no error in calling the attention of a jury to this principle and thus impressing upon them the importance of a verdict of guilty, if the defendant is so proven.

*Ross v. State*, 8 Wyo. 351, 371, 57 P. 924, 927 (Wyo.1899). With the exception noted, the prosecutor's closing taken as a whole reviewed the evidence presented by both sides, drew reasonable inferences from that evidence and asked the jury to return a verdict based upon that evidence. We re-emphasize what has previously been said: The principal responsibility to avoid error in final argument rests with counsel for litigants in their obligation to object during the course of the trial proceeding. *Barela*, 787 P.2d at 85, Urbigkit, C.J., specially concurring.

D. *Impermissible Hearsay Testimony Regarding Anticipated Return of Armstrong to the Ponderosa With a Gun*

Armstrong challenges the testimony of several eyewitnesses as containing inadmissible hearsay improperly used to show Armstrong went home to get his gun and, therefore, the shooting was premeditated. The series of challenged exchanges began when the prosecutor asked the bartender,

Tracy Roberts, her feelings at the time Armstrong left the bar:

Q. [PROSECUTOR] At about the time that Mr. Armstrong left, did you become concerned?

A. [MS. ROBERTS] Yes, I did.

Q. What was your concern?

A. I was afraid he was going to go get a gun.

Q. Did you express that concern?

A. Yes.

Q. What made you think that he was going to get a gun?

A. Because in the past, he had made comments about carrying a gun.

Q. All right. When did he make these comments to you in the past? When you waited on him at the bar?

A. Un-huh.

Q. Did he make comments about carrying a gun on more than one occasion?

A. He always said he has a gun in his boot, and if anyone gives him a reason, he'll use it and things like that. I never—I was just—I would be listening to him, yeah, sure. I didn't ever really take him serious.

Q. So that was your concern, that he might come back with a gun, and you expressed that concern to someone?

A. To Gary [Muckley, an eyewitness] and Lois [Muckley, another eyewitness] and to David [Anastos, the victim].

Q. What did you say?

A. I told him I'm afraid he's going to get a gun and come back.

Q. Did you ask David to leave because of that?

A. I says, "Why don't you leave and come back in about a half an hour". He says, "I ain't going anywhere. If he wants to come and shoot me, let him", and I tried begging him, pleading with him, "Please leave, I don't want no trouble here" and they kept saying, "He's not going to come back".

Q. Who kept saying he's not going to come back?

A. Gary and everybody, the three of them.

Armstrong offered no objection to this testimony at trial.

Armstrong did offer a hearsay objection when eyewitness Keith Phillips started to relate what Roberts told him when he walked into the bar. The prosecutor made an offer of proof that Phillips' testimony would not be offered to prove the matter asserted. The trial court overruled the objection and Phillips reported the bartender said: " 'Well, I'm sure glad to see you guys here. This guy just left to go get a gun.' " Armstrong objected to the comment as hearsay and asked that it be stricken. The prosecutor countered:

Your Honor, clearly, that statement is not offered to prove that a man just went to get a gun, but offered to prove that when he went in, he was told of the situation that existed prior to him coming in. That's—and to his state of mind and to his knowledge at the time. It doesn't—it doesn't go to prove that someone went to get a gun.

The trial court overruled the objection. Armstrong's trial counsel did not ask for a continuing objection or exception.

Three other witnesses were asked by the prosecutor if they heard Roberts express her concern. All three responded, without objection, that they did. Two of the witnesses, Gary and Lois Muckley, joined Roberts in urging the victim to leave. The third witness, Calvin Thorne, testified that after hearing Roberts, he stated that he did not believe Armstrong would return to the bar. No objections were offered to the introduction of these exchanges.

Where no objection was offered or exception taken to the trial court's ruling, the plain error standard discussed earlier must apply. *Bradley v. State*, 635 P.2d 1161 (Wyo.1981). Even if the hearsay evidence was improperly received, the appellant must show actual prejudice for this court to reverse. *Ostrowski v. State*, 665 P.2d 471 (Wyo.1983).

The repetition of the definition of hearsay is familiar, if not always understood. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to

prove the truth of the matter asserted." W.R.E. 801(c). "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion." W.R.E. 801(a). "A 'declarant' is a person who makes a statement." W.R.E. 801(b). The definition of "assertion" is not stated in the rule. However, a suitable definition declares an assertion is *"to say that something is so,* e.g. that an event happened or that a condition existed." E. Cleary, McCormick on Evidence § 246 (3d ed.1984) (emphasis in original).

Hearsay is generally not admissible except as provided by the Rules of Evidence or other law. W.R.E. 802. The primary basis for excluding hearsay evidence is the lack of opportunity to subject the declarant to cross-examination. McCormick on Evidence, *supra,* § 245. However, "when hearsay evidence, which would have been excluded if objected to, is let in without objection, it may be taken into consideration if it appears to be reliable in the particular case, as sufficient to sustain a verdict or finding of the fact thus proved." *Id.* at 728.

 The use of a self-defense theory in a homicide case makes the victim's state of mind a relevant evidentiary consideration. *State v. Kump,* 76 Wyo. 273, 301 P.2d 808 (1956).

> When evidence raises the issue whether the victim first attacked the defendant, evidence that the victim feared the defendant is highly probative of the declarant's future conduct, namely that the victim was not the aggressor. * * * In such cases the relevant state of mind may be established by the *victim's statement of fear or by the other evidence circumstantially probative of that condition.*

*People v. Madson,* 638 P.2d 18, 28 (Colo. 1981) (emphasis added). The appellant's goal would be to show the hostile attitude of the victim that would justify self-defense or perhaps reduce the degree of the crime or the severity of the sentence. *Kump,* 301 P.2d at 812.

 The analysis of an appellant's hearsay argument must be conducted in two stages. First, the testimony will be examined to determine if it was inadmissible hearsay. Second, if it was inadmissible hearsay, a determination of whether actual prejudice resulted will be required. Roberts testified about her feelings and perceptions. These statements are clearly not hearsay. Next, Roberts testified about Armstrong's practice of carrying a gun in his boot. As an admission by a party-opponent, this statement was not hearsay. W.R.E. 801(d)(2)(A).

Roberts' testimony about her statement to the victim and bar patrons that she was afraid Armstrong would return with a gun poses a more significant issue. The State argues that since Roberts was testifying about relevant history of the event, the testimony should be admissible. The State attempts to support its position by relying on *Ramos v. State,* 806 P.2d 822 (Wyo. 1991) and *Crozier v. State,* 723 P.2d 42 (Wyo.1986). The State's reliance is misplaced. The decisions discuss questions of admissibility of "bad acts" criminal activity under W.R.E. 404(b). The State's argument attempts to resurrect the simplicity of hearsay admissions under the abandoned doctrine of res gestae.

The adoption of the current Rules of Evidence in Wyoming creates a necessity for classification which precludes resort to the broad expanse of res gestae[8] admissions. *Horton v. State,* 764 P.2d 674 (Wyo. 1988); McCormick on Evidence, *supra,* § 288. Under res gestae, Wyoming once recognized that declarations which are substantially contemporaneous with the main fact of the homicide and so closely connected with it as to illustrate its character are admitted. *Kump,* 301 P.2d at 815.[9] The imprecision and generalization of res gestae admissions is evident from a simple

---

**8.** Literally, res gestae means "things done." Black's Law Dictionary 1173 (5th ed.1979).

**9.** In Chief Justice Blume's carefully crafted opinion in *Kump,* he notes the succession of

criticism which res gestae has been subjected to; however, lacking a suitable substitute, he adopted a working definition.

review of two decisions utilizing the standard articulated above.[10] In *Kump*, the court ruled that hearsay statements of the victim made the previous evening and morning of the day of the murder, relating threats from the appellant, should not have been admitted. In *State v. Holt*, 758 S.W.2d 182 (Mo.App.1988), the court allowed hearsay testimony of threats directed at the murder victim occurring two nights prior to the stabbing, as well as the evening of the event.

*Conner v. State*, 356 So.2d 336, *cert. denied* 364 So.2d 883 (Fla.1978) provides a factually similar illustration to the present case but with little precedential value in light of the vague res gestae ruling. In *Conner*, a father and his son were denied drinks at a Florida bar. Sometime during two fights that broke out in the bar, the son proclaimed, " '[Y]ou better watch out, my dad's a killer.' " *Id.* at 336. Later, the father shot two men. The father challenged admission of the son's statement as hearsay. The court ruled the son's statement admissible as res gestae or admissible as an excited utterance, or irrelevant but harmless in light of the other testimony at the trial. The better reasoned approach to res gestae categorizes the exceptions into present sense impressions, excited utterances, statements describing mental or physical condition, statements for the purposes of medical diagnosis or treatment, or verbal acts. 4 D. Louisell & C. Mueller, Federal Evidence § 438 (1980).

▇▇▇▇▇ Roberts was offering a statement made out of court. The first portion of the hearsay definition was thus satisfied. The critical determination is whether the statement was offered to prove the truth of the matter asserted; or, whether the statement was offered for another purpose which makes the hearsay exclusion inapposite. Our view is the latter is cor-

rect in this case. The testimony was offered for the valid non-hearsay purpose of showing the effect on the listeners. 4 D. Louisell & C. Mueller, *supra*, § 417. This non-hearsay assertion is admitted for the purpose of establishing the effect of the words on the mental or emotional state of the person hearing them. *Madson*, 638 P.2d at 28. Roberts' statement informed the victim of a potential threat to his life that she perceived. The statement was not hearsay, because it was not offered to prove that Armstrong really went home to get a gun. *State v. Magruder*, 234 Mont. 492, 765 P.2d 716 (1988). Without Roberts' statement serving as a necessary predicate, a repetition of the victim's lack of fear statement would have been disjointed. *People v. Duran*, 16 Cal.3d 282, 127 Cal. Rptr. 618, 545 P.2d 1322 (1976).

Armstrong's theory of the case was that he acted in self-defense. He asserted his theory during a pre-trial motion hearing to support introduction of the cocaine abuse evidence. Armstrong introduced this theory to the jury during voir dire. He testified he fired the gun to stop the victim, fearing another attack by the victim. The jury received detailed instruction on the right to self-defense. Armstrong's self-defense theory provides the reasoning to allow into evidence the hearsay evidence of the victim's state of mind. *Kump*, 301 P.2d at 812; *Magruder*, 765 P.2d at 719. The victim's statement, as reported by Roberts, was hearsay but admissible as a state of mind exception. W.R.E. 803(3); *see Whitmire v. State*, 789 S.W.2d 366 (Tex. App.1990). The repetition of Anastos' statement certainly did not prejudice Armstrong's case; if anything, it strengthened the self-defense argument by demonstrating the victim's lack of concern.

▇▇▇▇ When Armstrong objected to Phillips' repetition of Roberts' statement, the

---

**10.** The late legendary Judge Willis Ritter, of the United States District Court for Utah, offered his comments on res gestae while sitting on the Tenth Circuit by designation.

 The use of Latin words, e.g. *"corpus delicti"*, *"res gestae"* and the like, in the law of evidence, do (sic) not tend to throw much light upon the subject. Not infrequently one feels justified in suspecting that when a judge says evidence is admissible because it is part of the *"res gestae"* * * * the judge has a hunch it should be admissible or inadmissible, as the case may be, and resorts to a foreign language he doesn't understand for a reason.

*Manning v. United States,* 215 F.2d 945, 946 (10th Cir.1954).

prosecutor stated that the statement was not offered to prove the truth of the matter asserted. If the testimony was not offered to prove that Armstrong went home to get his gun, it was not hearsay. The testimony served to demonstrate the effect on Phillips' then existing state of mind as he witnessed developments occurring prior to the shooting. W.R.E. 803(3); *Fox v. State*, 497 N.E.2d 221 (Ind.1986). Phillips testified he brushed off Roberts' concern about someone returning with a gun as comments being made in a joking manner. The jury was entitled to weigh Phillips' state of mind into his report of suddenly paying attention to hearing Armstrong swear just before the shooting and seeing Armstrong walk toward the victim with a gun.

Similarly, the repetitions by Gary and Lois Muckley and Calvin Thorne of Roberts' assertion were not offered to prove Armstrong had left to get a gun. The assertion elicited admissible testimony from all three regarding their individual states of mind. W.R.E. 803(3). The Muckleys testified that they urged the victim to leave the bar as a result of Roberts' assertion. Thorne testified he did not believe Armstrong would return to the bar that evening. All of the testimony set the stage of the witnesses' observation of events and perceptive fear that a tragedy might be waiting to happen (as it did).

### IV.

### CHANGE OF VENUE

 Finally, Armstrong challenges the trial court's denial of a change of venue motion. Armstrong claims that prejudicial pretrial publicity prevented the conduct of a fair trial in Sweetwater County. Urging this court to reconsider the recent decision in *Amin v. State*, 811 P.2d 255 (Wyo.1991), Armstrong claims the publicity surround-

ing his case was factually inaccurate and that since the murder victim was the son of a local politician,[11] a community bias resulted which required a change in venue.

During the five weeks between the time of the murder and the filing of Armstrong's motion for change of venue, seven articles appeared in the two general circulation newspapers published in Sweetwater County.[12] Additional media exposure was provided by local cable television in three news broadcasts and six stories on a local radio station. The appearance of these news reports coincided with five events: the first reports of the shooting and Armstrong's arrest; the victim's death and funeral; Armstrong's initial court appearance; the preliminary hearing; and district court arraignment. The tenor of most of the coverage was factual and reported on testimony or statements from the court proceedings.

The exception to the generally factual reporting occurred in a Rock Springs Rocket–Miner newspaper article reporting on the August 1, 1990 initial appearance of Armstrong before a county court judge (hereinafter Rocket–Miner article). After reporting that Armstrong was charged with first-degree murder and "could face the death penalty," the newspaper stated that "[a]ccording to testimony from four witnesses to the shooting, Armstrong's own statements, and evidence gathered by police, there appears little doubt that Armstrong murdered Anastos."[13] The newspaper then reported on the results of a Green River Police Department search of Armstrong's room indicating that a torn shirt and a "bag of .38 bullets" were reportedly found. Also contained in the report were statements attributed to Armstrong that were made to Green River Police during booking. The Sweetwater County Attorney was quoted as saying Armstrong was

---

**11.** Anastos was the son of a Green River, Wyoming city councilman.

**12.** Armstrong failed to provide any proof of publication or date of publication with the newspaper articles. During the motion hearing, the trial judge noted this omission but admitted the exhibits into the record taking judicial notice of their authenticity as being from the pub-

lications identified by Armstrong. While we offer no opinion on the propriety of this procedure, attention to general principles of authentication and foundation are recommended.

**13.** The newspaper repeated this information in a September 11, 1990 article reporting that Armstrong had filed a change of venue motion with the district court.

arrested fifteen years ago for aggravated assault, but charges were dismissed. It is not clear from the Rocket–Miner article or the record if the search results, the booking information and the county attorney's statements were presented during the court appearance or were obtained by the newspaper separately. The account of the same proceeding carried by the Green River Star newspaper does not include the references to the booking, the search results or the county attorney's statements.

The standard of review for a change of venue was carefully enunciated in *Amin* and need only be summarized here. The prejudice existing against an accused must be such that it will have the effect of denying a fair trial. *Amin*, 811 P.2d at 257. Decisions to grant a change of venue are within the sound discretion of the trial court and will not be upset absent an abuse of discretion. *Id.* at 257–58.

The only distinction between the pre-trial publicity in *Amin* and the pre-trial publicity in this case concerns the content of the Rocket–Miner article. The court in *Amin* found the news reports in the record reflected factual reporting of the circumstances and none contained inflammatory language. *Id.* at 258. The questions before this court then become whether the language and the statements reported by the Rocket–Miner article were inflammatory and whether this single article created prejudice which affected the fairness of the trial.

Recognizing the importance of the rights addressed, we proceed with caution. The Sixth Amendment to the United States Constitution guarantees the right to a public trial by an impartial jury of the state and district where the crime was committed. U.S. Const. amend. VI. The Wyoming Constitution makes the right to trial by jury inviolate in criminal cases. Wyo. Const. art. 1, § 9. Balanced with these rights of the accused are those of the public as represented by the press and protected by the First Amendment.[14] U.S. Const. amend. I. In Wyoming, every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right. Wyo. Const. art. 1, § 20.

When the rights of the accused and the freedom of the press come into conflict, society's first protection lies in the personal responsibility and ethics of the individuals involved. Police, prosecutors, witnesses, judges, jurors and media share the responsibility to insure our system of justice functions in the ordered pace directed by due process guarantees. *See Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In the quest for instant information, all participants must show appropriate restraint from improper comment.[15] When such restraint fails, newspapers, in the enjoyment of their constitutional rights, may not deprive accused persons of their right to a fair trial. *Shepherd v. State of Florida*, 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740 (1951).

The judicial process is tasked with determining the guilt of an accused beyond a reasonable doubt. The Rocket–Miner article stopped just short of making that determination for the citizens of Sweetwater County. Stating that "there appears little doubt that Armstrong murdered Anastos" was plainly judgmental and inflammatory. The newspaper article also introduced inaccurate and inflammatory evidence to the public, such as the "bag of .38 bullets" found in a search of Armstrong's home, without the benefit of due process protection accorded in the courtroom.[16] The arti-

---

**14.** The relevant portion of the First Amendment states that "Congress shall make no law * * * abridging the freedom of speech, or of the press[.]"

**15.** *See* Note, *Free Press–Fair Trial: Can They Be Reconciled in a Highly Publicized Criminal Case?*, 79 Geo. L.J. 337 (1990).

**16.** At trial, the State introduced a photograph of a standard box of 50 pistol cartridges with six shells removed. The box was contained in a black piece of luggage along with brushes, baby powder and clothing. This was presumably the bag of bullets. Also mentioned in the article as being seized was correspondence found in Armstrong's home reportedly indicating that a female friend of Armstrong's had previously been subjected to violence. This irrelevant information was not introduced at trial.

cle offered statements given by Armstrong while in custody and which may or may not have been admissible or relevant in court.

The trial court considered four of the potential remedies available to a court once inflammatory publicity is present: "gag orders," change of venue, continuance and voir dire. The State requested a "gag order" to prevent additional inflammatory publicity about the change of venue hearing. The request was properly refused since inflammatory publicity was already present. The trial court then addressed the impact of the media coverage during the hearing on the change of venue motion. After testimony from the Green River Police Department public information officer and a local attorney, the trial court found some concerns existed about potential taint from the publicity in the case; however, the trial court denied the motion. The trial court viewed the change of venue request as a continuing motion which might be granted if jury selection proved impossible. The trial court did grant a continuance, at the request of the defense, to allow time to pass between the appearance of the inflammatory statements and the opening of the trial. Finally, voir dire proceedings were carefully structured to all individual members of the venire to be questioned in-chambers about the effect of publicity.

Jury selection took less than two days, including the time required for the individual in-chambers voir dire. One member of the venire indicated the articles in the newspaper made it seem to him that the case was "cut and dried." He did not sit on the jury. More common were expressions of distrust and disbelief in the ability of the local media. Of those selected to serve, eight jurors had read or heard some details of the shooting but could not remember specifics. Two jurors remembered some of what they had read or heard about the case. Two other jurors reported having no previous knowledge. Every mem-

ber of the panel said they would be able to base their decision on the testimony and evidence introduced during the trial.[17] Although all peremptory challenges were exercised, none of the individuals selected for the jury had been previously challenged for cause by Armstrong. Furthermore, Armstrong did not reassert or ask the trial court to rule on the motion for change of venue during or after the voir dire. *State v. Dambrell,* 120 Idaho 532, 817 P.2d 646 (1991). *Cf. Amin,* 811 P.2d 255.

The carefully controlled voir dire indicated that the inflammatory publicity had no affect on those who finally served. The prejudice which the article may have created did not deny Armstrong a fair trial; therefore, the trial court did not abuse its discretion in denying a change of venue. *Murry v. State,* 713 P.2d 202 (Wyo.1986).

## V.

## CONCLUSION

Finding no reversible error in the proceeding below, the judgment and sentence is affirmed.

---

17. W.S. 7–11–106 states:
 (a) It is not cause for challenge that a person called to act as a juror in a criminal case has formed or expressed an opinion as to the guilt or innocence of the accused from news media reports or rumor if:
 (i) The prospective juror states that he can lay aside his impression or opinion and ren-

der a verdict based on the evidence presented in court; and
 (ii) The court is satisfied, from the examination of the prospective juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at trial.